In re Gerald A. COLRUD, Sr. and Corrine Colrud, Debtors.

Bankruptcy No. 4–83–00058.

United States Bankruptcy Court, D. Alaska.

Dec. 14, 1984.

Kenneth P. Ringstad, Rice, Hoppner, Brown & Brunner, Fairbanks, Alaska, for debtors.

Gary W. Vancil, Fairbanks, Alaska, for Ralph Buckholtz.

## OPINION

J. DOUGLAS WILLIAMS, II, Bankruptcy Judge.

This matter is before the Court on the motion of creditor Ralph Buckholtz to lift the automatic stay to allow a judicial foreclosure sale of real property encumbered by Buckholtz's second mortgage. The property is necessary for the debtors' reorganization and the debtors have substantial equity in the property. Nevertheless, the stay will be modified to allow interest to accrue at the rate of 10.5% and to add to the principal owed any appreciation lost by Buckholtz in selling any of his gold and silver holdings to provide funds in lieu of those owed by the debtors. For the reasons given below, the modified stay will provide Buckholtz with the adequate protection mandated by § 362(d)(1) and § 361 of the Bankruptcy Code[1] (hereinafter the Code).

## FACTS

On June 20, 1972, Gerald and Corrine Colrud, dba Potpourri, Inc., signed a promissory note in the principal amount of $14,500.00, with interest at the rate of 6% per annum in favor of Ralph Buckholtz ("Buckholtz"). Payments were to be made over a five year period, in five equal payments plus the accrued interest, with the first payment due October 1, 1972. To secure the note, Gerald and Corrine Colrud, dba Potpourri, Inc., signed a second mortgage on a piece of real property located in Healy, Alaska, with Buckholtz as the mortgagee.

No payments were made on the note by the Colruds ("debtors") before the payoff date of October 1, 1979, and no payments were attempted thereafter except in con-

1. 11 U.S.C. § 101 *et seq.* The instant case was filed under the provisions of the Bankruptcy Reform Act prior to the passage of the Bankruptcy Amendments Act of 1984.

nection with settlement negotiations which failed. On January 11, 1983, a Chapter 11 petition was filed for Potpourri, Inc. The schedules and statements list the property in question as an asset of the estate, and Buckholtz as a creditor. Buckholtz proceeded on his note and mortgage in the Superior Court for the State of Alaska against the debtors, on the theory that the note and mortgage' were signed by the debtors as individuals and not on behalf of Potpourri, Inc. A default judgment was entered against the debtors on August 3, 1983 awarding Buckholtz $25,772.21, and a judicial sale of the property was to be held on September 12, 1983.

In a petition for rehearing in Superior Court, the debtors contended that the property was a Potpourri asset. Before the issue could be resolved in the Superior Court, the debtors filed an individual Chapter 11 petition on September 30, 1983. The property was also listed as an asset on the Colruds' schedules, and Buckholtz was listed as a creditor.[2] Thereafter, Buckholtz filed his Motion to Modify Stay in the instant case requesting that the stay be lifted to allow Buckholtz to complete the judicial foreclosure action.

Through testimony offered by Buckholtz, it was established that Buckholtz was building a log cabin on his property in Washington, and did not have sufficient funds to finish it. Although Buckholtz is living in the cabin, it has plywood doors, the roof is not finished and very little work has been done on the interior. Buckholtz also testified that he needs a new pickup truck to replace the one he currently drives, which is worn out. He estimated that his expenditures on the house and truck would be about $15,000.00.

Buckholtz receives a pension of about $300.00 per month, has a total of $2,200.00 in two bank accounts, and has stock with a market value of approximately $12,000.00. He also holds some bonds, which are due in 1986, with an approximate value of $20,-000.00 upon maturity. Besides the loan to the debtors, Buckholtz has made loans to individuals with outstanding balances of $1,300.00, $2,000.00, and $6,000.00, all of which are due in mid 1985 or later. No principal is to be paid on these loans until the due date. Buckholtz earned $4,000.00 working in August and September of 1983 in Alaska, and received about $290.00 in dividends on his stock during 1983. He received a loan repayment of $40,000.00 in the fall of 1983.

The majority of Buckholtz's assets consists of gold and silver bullion. In a deposition offered by the debtors, an agent of Buckholtz's broker estimated his holding of gold and silver to be worth $96,000.00 as of October, 1983, with the market value having decreased by $53,000.00 over the past year. The calculation did not include gold and silver purchased by Buckholtz with the $40,000.00 loan repayment. Buckholtz said he invested the loan repayment as he believed he would be receiving the money due on the debtors' note through the judicial foreclosure.

Mr. Buckholtz is seventy years old.

2. The debtors imply that relief from the automatic stay is inappropriate as questions exist as to whether the property belongs to Potpourri, Inc., or the individual debtors, and whether the individual debtors are liable on the note and mortgage due to the use of such inexact language in those instruments as "Gerald Colrud and Corrine Colrud, dba Potpourri, Inc." The matter of determining to which estate the property belongs and of which estate Buckholtz is a creditor cannot properly be litigated in a motion requesting relief from the stay in the individual debtors' Chapter 11 proceeding. Bankruptcy Rule 7001(2) provides that a proceeding to determine the validity, priority or extent of a lien, except a lien avoidance under Code § 522(f), must be by complaint as an adversary proceeding.

Moreover, a debtor's affirmative defenses and counterclaims against a secured creditor do not preclude this Court from granting adequate protection to the creditor until the defenses and counterclaims have been litigated and a final judgment, if any, has been entered diminishing the secured creditor's lien. Although the Court may consider the debtors' arguments in determining whether to lift the stay, the summary procedure used in a motion for relief from stay does not lend itself to a fully litigated determination on the matter. *See In re High Sky, Inc.,* 15 B.R. 332, 337–338, 4 C.B.C.2d 1290 (Bkrtcy. M.D.Pa.1981).

The property subject to the debtors' mortgage is located near Denali National Park. The debtors and/or Potpourri, Inc., run, among other things, a KOA campground, a grocery store and an automotive repair shop, all located on the property. Buckholtz estimated the property to be worth at least $250,000.00. The debtors submitted an appraisal of the property which gave the value as $395,000.00. The debtors also submitted that the total secured indebtedness on the property is about $104,000.00. To date, there has been no plan filed in the debtors' case. A disclosure statement and plan have been filed in the Potpourri, Inc., case but a hearing on the disclosure statement has not yet been held and no balloting on the plan has occurred.

## LAW

The debtors contend that Buckholtz is not entitled to lifting or modification of the automatic stay for two reasons. First, the debtors have substantial equity in the property, and they submit the existence of this "equity cushion" alone provides adequate protection for Buckholtz. Second, the debtors argue that because Buckholtz has purchased substantial amounts of gold and silver, which are high-

ly speculative investments, Buckholtz has evidenced a willingness and investment policy of taking substantial risks. According to the debtors, the willingness of Buckholtz to invest his money in markets more volatile than real estate precludes the court from imposing additional protection pursuant to § 361 of the Code. Based on the facts of this case, however, the Court finds that Buckholtz is not adequately protected by the equity cushion and that Buckholtz's investment in gold and silver is irrelevant. The stay must be modified in order to provide adequate protection. The debtors object to the modification of the stay proposed by the Court on the grounds that it is not in accordance with the Code.[3]

Section 362(d) of the Code provides that the Court may grant relief from the stay: (1) for cause, including the lack of adequate protection of the secured party's interest in property; and (2) with regard to an act against property, where the debtor has no equity in the property and the property is not necessary for an effective reorganization. Relief from the stay may be by terminating, annulling, modifying or conditioning the stay.[4] There is no question that the debtors have equity in the property on which Buckholtz holds a mortgage and that the property is essential to reorga-

---

**3.** Generally, pursuant to § 362(g), the debtor has the burden of proposing means by which the creditor requesting relief from the stay can be adequately protected. It is not the duty of the Court to formulate a method of providing adequate protection, and a debtor's failure to propose a method can result in a lifting of the stay due to lack of adequate protection. *In re Princess Baking Corp.*, 5 B.R. 587, 591, 6 B.C.D. 842, 2 C.B.C.2d 1071 (Bkrtcy.S.D.Ca.1980). However, because Buckholtz's attorney is in agreement with the Court's proposal, because of the equity either the debtors or Potpourri, Inc., have in the property, and because the property is necessary for a reorganization of the debtors or Potpourri, Inc., the Court will not lift the stay at the present time to allow the foreclosure proceedings to continue. Counsel should not assume that the ordinary practice of the Court will be to relieve the debtor of his burden to fashion an appropriate remedy.

**4.** Section 362(d) provides:
On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection

(a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—
(1) for cause, including the lack of adequate protection of an interest in property of such party in interest; or
(2) with respect to a stay of an act against property, if—
(A) the debtor does not have an equity in such property; and
(B) such property is not necessary to an effective reorganization.
Section 362(d)(2) has been amended by the Bankruptcy Amendments and Federal Judgeship Act of 1984 to refer to "a stay of an act against property under subsection (a) of this section." The purpose of the amendment was to clarify that the relief from stay available under § 362(d) is from the stay contained in 362(a). H.R.Rep. No. 96–1195, 96th Cong., 2d Sess. 11 (1980). The amendment applies to cases filed on or after October 8, 1984.

nization.[5] Accordingly, relief from the stay is available only under § 362(d)(1) for cause, including a lack of adequate protection of the secured creditor's interest.

The Code does not define the term "adequate protection." Instead, it provides a list of methods by which adequate protection can be met in § 361, which states:

When adequate protection is required under section 362, 363, or 364 of this title of an interest of an entity in property, such adequate protection may be provided by—

(1) requiring the trustee to make periodic cash payments to such entity, to the extent that the stay under section 362 of this title, use, sale, or lease under section 363 of this title, or any grant of a lien under section 364 of this title results in a decrease in the value of such entity's interest in such property;

(2) providing to such entity an additional or replacement lien to the extent that such stay, use, sale, lease, or grant results in a decrease in the value of such entity's interest in such property; or

(3) granting such other relief, other than entitling such entity to compensation allowable under section 503(b)(1) of this title as an administrative expense, as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property.[6]

■ The three methods of providing adequate protection are non-exclusive; that is, they are illustrative and not mandatory, and other methods may be used with the relief being suited to the facts of the case in question. *In re American Mariner Industries, Inc.,* 734 F.2d 426, 432 (9th Cir. 1984); 2 Collier on Bankruptcy ¶¶ 361.01 [1], [4] (15th Ed.1984). Subsections (1) and (2), by their language, are applicable to those situations in which the value of the secured creditor's interest in the property is decreasing. *In re Saypol,* 31 B.R. 796, 800, 10 B.C.D. 1057, CCH Bkr.L.Rptr. ¶ 69333 (Bkrtcy.S.D.N.Y.1983). Thus, neither subsection (1) nor (2) is relevant to the outcome of Buckholtz's motion as no evidence was presented that the value of Buckholtz's interest in the property is decreasing.

■ Subsection (3) of § 361, the remaining illustration of adequate protection, requires that the secured creditor receive the "indubitable equivalent" of the secured creditor's interest in the property. The indubitable equivalent standard of subsection (3) has been determined by one commentator to be a "catch-all", with "ample room ... given ... for case by case development of the appropriate standards." 2 Collier on Bankruptcy ¶ 362.07[1] at 362–46, 362–47 (15th Ed.1984). In *In re Alyucan Interstate Corp.,* 12 B.R. 803, 805, 7 B.C.D. 1123, 4 C.B.C.2d 1066 (Bkrtcy.Utah 1981), the Court discussed the failure of Congress to define adequate protection, and, quoting from the legislative history, stated:

This omission was probably deliberate. Congress was aware of the turbulent rivalry of interests in reorganization. It needed a concept which would mediate polarities. But a carefully calibrated concept, subject to a brittle construction, could not accomodate the "infinite number of variations possible in dealings be-

---

5. It is assumed for purposes of Buckholtz's motion only that the individual debtors, and not the corporate debtor, own the property in question and the businesses conducted thereon, and that Buckholtz is a creditor of the individual debtors. However, the assumption shall have no binding effect in any subsequent litigation with regard to the ownership of the property and the effect or validity of Buckholtz's lien vis-a-vis the property. *See* footnote 2, *supra.*

6. Section 440 of the Bankruptcy Amendments and Federal Judgeship Act of 1984 amends § 361(1) to provide that adequate protection may be provided by the trustee making "a cash payment or periodic cash payments". The amendment adds as a means of providing adequate protection the option of making a one-time cash payment as an alternative to periodic cash payments. S.Rep. No. 98–65, 98th Cong., 1st Sess. 76 (1983). The amendment applies to cases filed on or after October 8, 1984.

tween debtors and creditors." ... This problem required, not a formula, but a calculus, open-textured, pliant, and versatile, adaptable to "new ideas" which are "continually being implemented in this field" and to "varying circumstances and changing modes of financing."

(Citations omitted). Subsection (3) provides the flexibility which Congress thought necessary, requiring only that the secured creditor receive the indubitable equivalent of his interest. Accordingly, the boundaries of the indubitable equivalence standard must be examined in light of the facts of a particular case in order to determine what constitutes adequate protection of a creditor's interest.[7]

The phrase "indubitable equivalent" has its genesis in the opinion of Judge Learned Hand writing for the court in *In re Murel Holding Corporation*, 75 F.2d 941 (2nd Cir.1935). In *Murel*, the Metropolitan Life Insurance Company held a mortgage in the amount of $400,500.00 on an apartment house owned by the debtors. When Metropolitan attempted to foreclose on its mortgage, the debtors filed petitions under § 77B (the predecessor to Chapter X under the Bankruptcy Act), and obtained an ex parte stay against the foreclosure.[8] The debtors then filed a plan of reorganization which provided that an advance by another creditor was to have priority over Metropolitan's mortgage, and Metropolitan was not to receive any amortization payments for a ten year period but would receive interest of 5½% during such time. Metropolitan refused to approve the plan.

Judge Hand noted that the provisions of § 77B would allow what is now termed a "cram-down" of the plan on Metropolitan if Metropolitan was adequately protected by the plan, which could be accomplished in one of four ways. Three of those methods were not adopted by the debtors in proposing the plan. In discussing the fourth method, Judge Hand stated:

> The last is not, properly speaking, a "method" at all; it merely gives power generally to the judge "equitably and fairly" to "provide such protection" that is, "adequate protection," when the other methods are not chosen. It is this alone which the debtors here invoke. In construing so vague a grant, we are to remember not only the underlying purposes of the section, but the constitutional limitations to which it must conform. It is plain that "adequate protection" must be completely compensatory; and that payment ten years hence is not generally the equivalent of payment now. Interest is indeed the common measure of the difference, but a creditor who fears the safety of his principal will scarcely be content with that; he wishes to get his money or at least the property. We see no reason to suppose that the statute was intended to deprive him of that in the interest of junior holders, unless by a substitute of the most indubitable equivalence.

*Id.* at 942. After noting that it was the creditor who was compelled to take the chance of the debtors' success, and that

---

7. Many articles have been written discussing the automatic stay and adequate protection. Three which analyze the approach of the Code and suggest courses different from that taken by Congress are Jackson, *Bankruptcy, Non-Bankruptcy Entitlements, and the Creditors' Bargain,* 91 Yale L.J. 857 (1982); Gordanier, *The Indubitable Equivalent of Reclamation: Adequate Protection for Secured Creditors Under the Bankruptcy Code,* 54 Am.Bankr.L.J. 299 (1980); and James & Kirkland, *Adequate Protection Through Augmented Interests in Reorganization Plans,* 58 Am.Bankr.L.J. 69 (1984). The Court cites these not for the purpose of indicating support for the authors' proposals but to show that although everyone agrees that adequate protection should

be given, the proposals for how it is to be given are wide ranging.

8. An automatic stay upon the filing of the petition was not imposed by statute before the passage of the Code, which contains such a stay at § 362. At the time Murel was decided, the debtor was required to request a stay against a creditor. Subsequently, under the Rules of Bankruptcy Procedure, a number of automatic stays were provided for by rule. For a discussion of stays under the Bankruptcy Act and the Rules of Bankruptcy Procedure, *see* 2 Collier on Bankruptcy ¶ 362.01 (15th Ed.1984). It is interesting to note in Murel that Judge Hand stated that "a stay should never be the automatic result of the petition itself...." 75 F.2d at 943.

there was not a clear enough showing that the plan would succeed, the court reversed the order imposing the stay. Three points should be noted about *Murel.* First, providing adequate protection is a matter of equitable considerations; second, the payment of interest alone, under the facts of the case, was not enough to provide adequate protection; and third, the court did not feel that the creditor should be required to bear the risk of the debtors' plan.

The phrase "indubitable equivalent" was first used by the Senate in § 1129(b)(2)(A)(iii) of the Code, which is the cram-down provision. It was added as a means of providing adequate protection under § 361 as part of a compromise between the House, which wanted greater flexibility for the courts to determine what constitutes adequate protection, and the Senate, which wanted only the two specific methods contained in subsections (1) and (2).[9] In discussing the illustration of adequate

protection which became § 361(3), the House noted that:

Secured creditors should not be deprived of the benefit of their bargain. There may be situations in bankruptcy where giving a secured creditor an absolute right to his bargain may be impossible or seriously detrimental to the bankruptcy laws. Thus, this section recognizes the availability of alternate means of protecting a secured creditor's interest. *Though the creditor might not receive his bargain in kind, the purpose of the section is to insure that the secured creditor receives in value essentially what he bargained for.*

H.Rep. No. 95–595, 95th Cong., 1st Sess. 339 (1977), U.S.Code Cong. & Admin.News 1978, 5787, 6295. (Emphasis added). The subsection was then explained as giving:

... the parties and the courts flexibility by allowing such other relief as will result in the realization by the protected entity of the value of its interest in the

---

**9.** Section 361 as contained in the House bill, H.R. 8200, 95th Cong., 1st Sess. (1977) provided that:

When adequate protection is required under section 362, 363, or 364 of this title of an interest of an entity in property, such adequate protection may be provided by—

(1) requiring the trustee to make periodic cash payments to such entity, to the extent that the stay under section 362 of this title, use, sale, or lease under section 363 of this title, or any grant of a lien under section 364 of this title results in a decrease in the value of such entity's interest in such property;

(2) providing to such entity an additional or replacement lien to the extent that such stay, use, sale, lease, or grant results in a decrease in the value of such entity's interest in such property;

(3) entitling such entity to compensation allowable under section 503(b)(1) of this title as an administrative expense, to the extent that such stay, use, sale, lease, or grant results in a decrease in the value of such entity's interest in such property, if the estate will contain sufficient assets to pay such administrative expense in the event of liquidation of the debtor; or

(4) granting such other relief as will result in the realization by such entity of the value of such entity's interest in such property. Section 361 of the Senate bill, S. 2266, 95th Cong., 2nd Sess. (1978), deleted the methods contained in subsections (3) and (4) of the House version of § 361. The remaining two

subsections, (1) and (2), were to be exclusive means of providing adequate protection. S.Rep. 95–989, 95th Cong., 2nd Sess. 54 (1978).

As it was finally enacted, § 361 was promulgated as part of a compromise bill, which was sent to both houses with a joint explanatory statement. According to the statement, subsection (3) of the House bill, which allowed a court to provide adequate protection by giving the secured creditor an administrative expense for any decrease in the value of the collateral, was deleted, and subsection (4) of the House bill was modified in section 361(3) of the compromise bill to allow the court to grant other forms of adequate protection, other than as an administrative expense, which would result in the secured creditor realizing the indubitable equivalent of the creditor's interest in the property. 124 Cong.Rec. 32356 (Sept. 28, 1978), 124 Cong. Rec. 33994–33995 (Oct. 5, 1978). In *In re American Mariner Industries, Inc.,* 734 F.2d 426, 433–434 (9th Cir.1984) it was noted that the "indubitable equivalent" standard of § 1129(b)(2)(A)(iii) carries with it a right on the part of the secured creditor to compensation for present value, and codifies the strict approach taken in Murel. According to the court in American Mariner, Congress intended the same strict approach of compensation for present value to apply in § 361(3) as ultimately enacted, which also contains the "indubitable equivalent" standard. *Id.* at 434.

property involved. Under this provision, the courts will be able to adapt to new methods of financing and to formulate protection that is appropriate to the circumstances of the case if none of the other methods would accomplish the desired result.

*Id.* at 340, U.S.Code Cong. & Admin.News 1978, at 6296.

■■■ Congress intended that § 361(3), with its language of indubitable equivalence, be a flexible provision which would allow the courts to consider new ways of protecting secured creditors and to consider alternatives appropriate to the unique facts of those cases for which the methods of subsections (1) and (2) do not give the creditor the value for which he had bargained. In place of this flexibility, the debtors propose that the rigid and unyielding test of looking solely at the "equity cushion" be substituted. The debtors argue that if there is an equity cushion sufficient to provide for the creditor's lien and the accruing interest, the creditor is always adequately protected, relying on the recent case of *In re Mellor*, 734 F.2d 1396 (9th Cir.1984). A careful reading of both *Mellor* and *In re American Mariner Industries, Inc.*, 734 F.2d 426 (9th Cir.1984) however, shows that equitable considerations other than the equity cushion must be taken into account in determining if the creditor is adequately protected.

In *Mellor*, the debtors' residence was encumbered, in descending order of priority, by a deed of trust held by Weyerhaeuser Mortgage Corporation, a land sale contract owned by Raymond G. Bragg, a second deed of trust and five judgment liens. Because the debtors were substantially behind in their payments, Weyerhaeuser requested and obtained relief from the automatic stay in order to foreclose on its deed of trust. Neither Bragg nor his predecessor in interest, Raymond Pistole, (hereinafter collectively referred to as Bragg) joined in Weyerhaeuser's action, although the debtors had not made any payments on the land sale contract for several years.

Instead, Bragg filed a motion for summary judgment in a quiet title action in state court, which had been commenced before the debtors' bankruptcy petition was filed. The state judge construed the order lifting the stay in the Weyerhaeuser proceeding as terminating all stays with regard to the property, and granted Bragg's motion for summary judgment to quiet title against the debtors.

Weyerhaeuser, whose interest was senior to Bragg's, gave notice that the property was to be sold at a trustee's sale. Prior to the date of the sale, Bragg cured the default by paying Weyerhaeuser $12,460.06. Bragg then requested relief from the automatic stay. The bankruptcy court found that all of the encumbrances against the property totaled $199,801.05, as compared to the property's present value of $105,-000.00. Based on these findings, and the conclusion that the debtors had no equity in the property, the stay was annulled as of the date that relief from the stay was granted to Weyerhaeuser. No findings were made as to any damage which Bragg would incur should the stay be continued, nor as to the effect on Bragg of having paid the amount of the debtors' default on the Weyerhaeuser deed of trust.[10]

The debtors appealed from the order of the bankruptcy court annulling the stay, arguing in part that the second deed of trust was voidable as a preferential transfer, which would give the debtors equity in the property and which would provide an equity cushion for Bragg, and that it was also error for the bankruptcy court to consider liens junior to Bragg's in determining whether there was an equity cushion which would adequately protect Bragg. The debtors also argued that the property was necessary in order for the debtors to carry out a successful Chapter 11 plan. In the Bankruptcy Appellate Panel's opinion, 31 B.R. 151 (Bkrtcy.App.Panel 9th Cir.1983), the panel determined that annulment of the stay is an action within the power of a bankruptcy court, and held that:

---

**10.** *Pistole v. Mellor,* SB 81–0287 DN (In re Mellor), (Bkrtcy.C.D.Cal., June 1, 1981).

The panel finds cause sufficient for the annulment of the automatic stay as to these appellees, regardless of the question of the debtors' alleged equity in the Upland real property. In this regard, lack of equity is only one basis for relief from an automatic stay. Also important, in this case, were the adequate protection and equitable concerns of the appellees in having to carry the burden of the debtors' obligation to Weyerhaeuser after the [debtors] failed to oppose that secured creditor's request to lift the automatic stay. Inasmuch as the [debtors] never actually attempted to alleviate that burden, notwithstanding their subsequent statement of willingness to do so, we cannot say that the trial court erred in refusing to continue the imposition of this duty upon the appellees.

*Id.* at 155.

■■■■ The Court of Appeals reversed the decision of the Bankruptcy Appellate Panel in *In re Mellor,* 734 F.2d 1396 (9th Cir.1984), holding that junior liens cannot be considered for purposes of determining whether a creditor is adequately protected

pursuant to § 362(d)(1).[11] The amount owed to Bragg, including the amount paid by Bragg on Weyerhaeuser's deed of trust the only lien senior to Bragg, was $66,-700.00, leaving an equity cushion of $20,-340.00. The court noted that the bankruptcy court's conclusion that Bragg lacked adequate protection was apparently based solely on the debtors' lack of equity, and held that "[t]he fact that the debtor has no equity in the estate is not sufficient, *standing alone,* to grant relief from the automatic stay under section 362(d)(1)." *Id.* at 1400. (Citation omitted, emphasis added). The conclusion to be drawn is that an equity cushion will suffice as adequate protection under § 362(d)(1) and § 361 provided there are no other factors which weigh more heavily in the creditor's favor.[12] If there are facts which show that the equity cushion by itself will not adequately protect the creditor by giving him the benefit of his bargain, then the automatic stay must be lifted or modified in order for the requirements of § 362(d)(1) to be met.

An explanation of the interests of the creditor which must be adequately protect-

11. In determining if the debtor has equity in the property for purposes of § 362(d)(2), however, equity is defined as the difference between the value of the property and the *total* amount of the liens against the property. *Stewart v. Gurley,* 745 F.2d 1194 (9th Cir.1984). *See also In re Mellor,* 734 F.2d at 1400–1401.

12. The Court of Appeals in Mellor also concluded that the order of the bankruptcy court must be reversed as the bankruptcy court had "erred in its implied finding that the [property] was unnecessary to effect a reorganization." *Id.* at 1402. The Court of Appeals stated that the evidence must show that the property is not necessary for an effective reorganization in order for relief to be granted under § 362(d)(2), and the bankruptcy court had failed to make any findings on this issue. It is respectfully submitted that the bankruptcy court's findings and conclusions are susceptible to the reading given by the appellate panel, namely that the creditor was entitled to relief from the stay under § 362(d)(1) because he had not been compensated or adequately protected for having had to cure the debtor's default in failing to make payments to another secured creditor who would have foreclosed on the property. The bankruptcy court did not simply apply an equity cushion test, but considered the equities of a creditor having had to carry the debtor's burden

of paying another secured creditor. Thus, it was not essential for the Court of Appeals to address the second test of § 362(d). There are two *alternative* tests: (1) a change in the automatic stay by termination, annulment, modification or conditioning may be made pursuant to § 362(d)(1) for cause, including a lack of adequate protection; or (2) under § 362(d)(2) the stay may be terminated, annulled, modified or conditioned if the debtor has no equity in the property and the property is not necessary to an effective reorganization. 124 Cong.Rec. S17,409 (Daily ed. October 6, 1978). The bankruptcy court in Mellor annulled the stay for lack of adequate protection based on § 362(d)(1). Accordingly, it was not essential for the bankruptcy court to make any findings with regard to the necessity of the property to an effective reorganization, as such a finding is only necessary to the test contained in § 362(d)(2). Nevertheless, pursuant to the Court of Appeals' decision in Mellor, it is important for a bankruptcy court to fully articulate under § 362(d)(1) the impact that a debtor's breaches have upon a creditor who, for example, has had to advance funds to protect his interest. Absent other factors, the value of the property may adequately protect a creditor required to make such advances.

ed is contained in *American Mariner, supra,* in which Crocker National Bank, an undersecured creditor of the debtor, appealed a decision of the Bankruptcy Appellate Panel which held that an undersecured creditor was not entitled to interest as part of adequate protection. In the Panel's view, § 361 protected a creditor only against a decline in the value of the property which serves as collateral, which decline results in an impairment of the creditor's interest. As a necessary corollary to its decision, the Bankruptcy Appellate Panel stated that a creditor was not entitled to compensation for the loss of its ability to foreclose on the property, sell it, and reloan the money owed to it by the debtor at a current interest rate.

The Bankruptcy Appellate Panel decision was reversed in *American Mariner* in which the Court of Appeals held that Crocker was entitled under § 361 to adequate protection of its *interest* in the collateral, not just to protection against depreciation in the value of the property. The court explained that:

> Both the House and Senate Reports clearly express the congressional intention to provide protection for the secured creditor's interest and not merely the value of the collateral .... As the appellate panel observed, the reports do not specifically mention the secured creditor's legal right to take possession of and sell the collateral; nor do the reports mention the creditor's equitable right to reinvest the proceeds of the sale. Unquestionably, however, these are valuable rights of secured creditors, and nothing in the reports suggests they are not among those equitable and legal interests entitled to protection.
> ... We are convinced, therefore, that the case-by-case development, guided by equitable principles as Congress envisioned, must recognize and protect the *value* of a creditor's interest when, as here, that value is demonstrated to exist and is measurably threatened.

*Id.* at 430–432 (original emphasis). It was further noted that the creditor is not always entitled to take possession of and sell the collateral, particularly if the collateral is necessary to the effective reorganization of the debtor. In such circumstances, value "in kind" may be substituted, provided the substitute "both compensate[s] for present value and insure[s] the safety of the principal." *Id.* at 433.

The Court concluded:

> The secured creditor's right to take possession of and sell collateral on the debtor's default has substantial, measurable value. The secured creditor bargains for this right when it agrees to extend credit to the debtor and both parties consider the right part of the creditor's bargain. The right constitutes an "interest in property," that is "created and defined by state law," and we are aware of no federal interest that requires this right of the secured creditor to go unprotected "simply because an interested party is involved in a bankruptcy proceeding."

*Id.* at 435. (Citation omitted).

In many cases the existence of an equity cushion and the accrual of interest pursuant to § 506(b) will give the creditor the benefit of his bargain and constitute adequate protection.

In the instant case, however, the equity cushion is not adequate protection for Buckholtz. The debtors' loan is not only in default, it is long past due and no payments have been made. The loan bears interest at 6% per annum, far below any current market rate. Buckholtz is not an institutional investor. He is a man of seventy years, who works sometimes in the summer, and who receives a small pension.[13] Two of his major assets are a piece of real estate in Washington and some non-interest bearing bonds which will not mature until 1986, and which are not liquid. Buckholtz testified he needed the money

---

**13.** Presumably debtors are not to be taken seriously in their suggestion that Mr. Buckholtz, a man of seventy years of age, could earn money if he needed it by working outdoors in the winter weather of Fairbanks where temperatures reach forty degrees below zero or colder.

due from the debtors for his personal use. Although he could sell some of his gold and silver to provide for his needs, he would suffer a considerable loss.

As noted earlier, the debtors argue that because investing in precious metals is risky, and because Buckholtz invested $40,000.00 in gold and silver in the fall of 1983 before moving for relief from the stay, his willingness to make such speculative investments obviates the requirement of § 362(d)(1) for adequate protection. The fact, however, that Buckholtz in the past invested in gold and silver is irrelevant since Buckholtz is not planning to invest the debtors' loan repayment in precious metals. He would like to use the repayment to finish the cabin he is living in and to buy a truck to replace his old one. Moreover, Buckholtz testified that he reinvested the $40,000.00 as he believed he would be repaid what the debtors owe him through the foreclosure proceeding. However, because there are other creditors in the cases of both the Colruds and Potpourri, Inc., and because the property in question is crucial to the debtors' business rehabilitation, the equitable considerations are against lifting the stay to allow the foreclosure to proceed before the debtors or Potpourri, Inc. are given a chance to proceed with an attempt at confirming a plan. Accordingly, a modification of the stay to provide for adequate protection of Buckholtz will most equitably and fairly meet all the considerations.

■ As noted above, Buckholtz holds a considerable amount of gold and silver bullion, but he would also suffer a loss if forced to sell now. The debtors' note is past due, and bears only a 6% interest rate. With these considerations in mind, the per annum interest rate on the debt owed to Buckholtz will be raised to 10.5%.[14] In addition, Buckholtz's attorney's fees for his motion for relief from stay and his expenses in flying from Seattle to Fairbanks for the hearing will be added to the principal of the debt owed by the debtors.[15]

Buckholtz will still be required to sell some of his precious metals to provide funds in lieu of those he would have received upon foreclosure of the debtors' property. If the precious metals appreciate in price in the period between the sale of either the gold or silver and the time the debtors repay Buckholtz, and the appreciation is in excess of 10.5%, Buckholtz will not have received the indubitable equivalent of his lien, which note it secures is long overdue and upon which he could have foreclosed had it not been for the automatic stay. Accordingly, upon notice to the debtors of a sale of either gold or silver and of the price received by Buckholtz, thereafter upon repayment by the debtors of their obligation Buckholtz will be entitled to receive the appreciation, if any, in excess of the 10.5% per annum simple interest provided for above on the quantity sold. In essence, the debtors will be giving Buckholtz an option to repurchase the precious metal he was forced to sell to provide money for his personal needs, so long as the appreciated price at the time the debtors repay the loan

14. Buckholtz's attorney requested the 10.5% interest rate, which is the interest rate on state court judgments as codified in AS 09.30.070, and is the rate Buckholtz would have received on any deficiency judgment had the state court foreclosure sale proceeded to a conclusion. The higher interest rate will begin accruing from the date of the final hearing on the motion for relief from stay. The new interest rate and its effective date meet the guidelines promulgated by the court in *American Mariner, supra* note 9, at n. 5 of its opinion, in which it is stated that the timing of adequate protection should take into account the usual time and expense involved in the foreclosure and sale of collateral. The court also stated that care should be taken with regard to the interest rate. To allow an underse-

cured creditor to receive the market rate where the market rate exceeds the contract rate would allow a windfall to the undersecured creditor. As previously noted, Buckholtz had begun foreclosure proceedings which were stayed by the filing of the debtors' petition, and the interest rate set is what Buckholtz would have received had the state court suit proceeded to a judgment.

15. Buckholtz's attorney requested that the stay be lifted so Buckholtz could request the additional attorney's fees incurred in this proceeding from the state court. The debtors' attorney did not object when it was suggested by the Court that the fees simply be added to the principal.

is in excess of 10.5% per annum interest at the time it was sold by Buckholtz.

The prescribed modification of the automatic stay will meet all the competing considerations of this particular case. The debtors will be given an opportunity to reorganize their business affairs, but they will not be allowed to rely on their equity cushion to the detriment of Buckholtz. Buckholtz will not be forced to continue a past due loan to the debtors at a 6% interest rate, and although he will be forced to sell some of his precious metals to provide current funds, he will receive any appreciation in excess of 10.5% upon the debtors' repayment and so will be in a position to reinvest in the same quantity of gold or silver, should he so choose, without detriment. The ruling of the court shall remain in effect until the confirmation of the debtors' plan or until the determination of any further motion for relief from stay based upon changed circumstances.

An order will be entered accordingly.