**In re INDEPENDENCE VILLAGE, INC., Debtor.**

**Bankruptcy No. 85–09039.**

United States Bankruptcy Court, E.D. Michigan, N.D.

Sept. 4, 1985.

Dykema, Gossett, Spencer, Goodnow & Trigg by Ronald L. Rose and Leland L. Bull, Jr., Detroit, Mich., for New Century Bank.

Lambert, Leser, Hebert, Dahm, Giunta, Cook & Schmidt, P.C. by Susan M. Cook and Rozanne M. Giunta, Bay City, Mich., for debtor.

Braun, Kendrick, Finkbeiner, Schafer & Murphy, by Harvey D. Walker, Saginaw, Mich., for Official Bondholders' Committee.

Arnold S. Schafer, Birmingham, Mich., for Official Residents' Committee.

Hertzberg, Jacob & Weingarten, P.C. by Stuart E. Hertzberg, Detroit, Mich., for Lutheran Homes of Michigan, Inc.

## MEMORANDUM OPINION RE: NEW CENTURY BANK'S MOTION FOR POSSESSION OF PREMISES OR IN THE ALTERNATIVE FOR RELIEF FROM THE STAY

ARTHUR J. SPECTOR, Bankruptcy Judge.

Independence Village, Inc. is a Michigan non-profit corporation which operates a 252-unit life-care facility for the elderly, located in Frankenmuth, Michigan. Its construction was financed by a loan made to it by the Economic Development Corporation of the City of Frankenmuth ("EDC"). The EDC borrowed the $14 million necessary for the construction of the facility from approximately 1,000 individuals and institutions, in return for its tax-exempt bonds which were secured by a mortgage on the premises. New Century Bank [1] was designated as trustee of the bondholders. The EDC received legal title to the premises and leased them to Independence Village, Inc. at a rental which, in the aggregate, equals the amount sufficient for the payment in full of all of the bonds, including interest and any prepayment redemption premium. The trustee's duties were and are to take custody of the $14 million and disburse such sums as were needed for construction, to receive and account for rent payments made by Independence Village, Inc., to receive as escrow agent and account for deposits made by Independence Village, Inc. of "entrance fees" received from occupants of the life-care facility, to receive and account for any insurance proceeds obtained by Independence Village, Inc., to inspect the premises, to receive information concerning the facility, and to enforce remedies in the event of default.

Independence Village, Inc. is wholly owned by Lutheran Homes of Michigan, Inc., another Michigan non-profit corporation. On February 1, 1985, Independence Village, Inc. filed a voluntary petition under Chapter 11 of the Bankruptcy Code. On April 4, 1985, Lutheran Homes of Michigan, Inc. filed a voluntary petition under Chapter 7 of the Bankruptcy Code in this Court's Detroit administrative unit.

On April 4, 1985, New Century Bank, as trustee of the bondholders, filed its "Motion for Relief Under § 365(d)(4) or, in the Alternative, to Lift Under § 362(d)(1) and § 362(d)(2) Automatic Stay to Permit Mortgagee to Enforce Rights Under Mortgage." The debtor resists the motion. A hearing was held thereon, at which testimony was elicited and evidence received. The parties have extensively briefed the novel issues of law. Where facts are stated herein, they shall be deemed findings of fact; where statements of law are contained herein they shall be deemed the Court's conclusions of law.

The principal issues to be decided include:

(A) Is the property in question "leased" to the debtor?

(B) Is this property "nonresidential real property" for purposes of § 365(d)(4) of the Bankruptcy Code?

(C) Is the property necessary for an effective reorganization, or, in the context of this case, does the debtor have any possibility of effectively reorganizing?

(D) If the transaction is not a lease of nonresidential real property, then are the bondholders' secured claims adequately protected?

## (A) IS THIS A LEASE?

The bank's motion alleges that the 60th day after the filing of the case was April 2, 1985, and that by the end of that day, the debtor had not assumed or rejected the

---

**1.** The bank was known as Frankenmuth Bank & Trust Co. at the time of the financing arrange- ments.

lease of the premises from the EDC. Therefore, it says, pursuant to § 365(d)(4) of the Bankruptcy Code, the lease is deemed rejected, and the debtor should be compelled to immediately surrender the property to the lessor. Inasmuch as the bank was granted an assignment of the EDC's rights against the debtor, it claimed to be a proper party to seek such relief. The debtor denies that the transaction between it and the EDC was a lease, claiming that the transaction was intended to be a sale with retention of a purchase money mortgage. Therefore, it argues, § 365 is inapplicable.

The debtor argued, and the Court finds, that the operative agreement between it and the EDC, the "Lease Purchase Contract" of October 16, 1980 is ambiguous. Even its title is ambiguous. Its terms contemplate title remaining in the EDC and payments of rent by the debtor, yet it also states that "it is the intention of the issuer [EDC] and the company [Independence Village, Inc.] that the contract shall be treated for all purposes as a lease purchase contract and not a lease." (§ 14.2 of Lease Purchase Contract). Because of the ambiguity of the document, evidence of the intention of the parties to the transaction is admissible on the interpretation of the contract's terms. *Sawyer v. Arum*, 690 F.2d 590 (6th Cir.1982); *VanKoevering v. Manufacturer's Life Ins. Co.*, 234 F.Supp. 786 (W.D.Mich.1964); *Goodwin v. Coe Pontiac, Inc.*, 392 Mich. 195, 220 N.W.2d 664, *vacated in part*, 392 Mich. 195, 224 N.W.2d 53 (1974).

The debtor offered the testimony of David Fisher, an attorney in Saginaw, Michigan who represented the EDC at the time this contract was negotiated, drafted and executed. Mr. Fisher testified that notwithstanding the lack of discussion relative to § 14.2 of the contract, his client and its directors were concerned that there be no way that they could ever be subject to landlord liability as a result of this transaction. Therefore, it was their intention that the contract be read in such a way that the EDC would not be deemed to be a "landlord". "Landlord" is a synonym for "lessor". If one of the two parties to a contract intend that the document be read in a way that would make it not a "lessor", that is strong evidence to suggest that the parties did not intend to enter into a lease.

The debtor also argues that the substance of the transaction was a sale and mortgage rather than a lease. It asserts that the EDC retained none of the risks or burdens imposed upon a lessor. For example, the EDC disclaimed all liability, assigned to the bank all of its enforcement powers, and delegated to the debtor the duty to pay all taxes, insurance, and maintenance costs, including the obligation to make its rental payments directly to the mortgagee, New Century Bank, on behalf of the bondholders. The most important argument is that the "rental payments" are identical to the principal, interest and other expenses incurred by the EDC as a legal consequence of its obligation to the bondholders. For the mere peppercorn of $100 (which can easily be justified as administrative expenses for the drafting and filing of the appropriate legal documents), the debtor is entitled to a "deed" from the EDC once the bonds are fully paid or redeemed. Notably, the contract does not merely give the debtor an option to obtain title, but actually requires it. § 13.2.[2]

In a case whose operative facts are materially identical to those at bar, the court in *In re Central Foundry Co.*, 48 B.R. 895 (Bankr.N.D.Ala.1985), held that the EDC-type (there the municipal entity was known

---

**2.** As further support for its argument that the contract does not constitute a lease, the debtor points to § 3.1 of the Contract, which contains this language: "Inasmuch as the foregoing conveyance of the project by the company to the issuer may be deemed a financing transaction under the Michigan Uniform Commercial Code ..." and argues that the bank acknowledged that this was therefore a financing arrangement and not a lease. This is a make-weight. The prophylactic measure of anticipating obvious legal claims and disposing of them inside a contract ought not to be read as an admission of the very point one party is arguably seeking to avoid.

as the Industrial Development Board or IDB) "lease" was not a true lease but was, in effect, a disguised security arrangement. As a result, administrative expenses flowing from the breach of that "lease" were not allowed. There the IDB issued tax-free bonds through a bank, the trustee of the bond issue, to finance the construction of pollution control equipment. The $2.25 million bond issue was secured by six parcels of land, the pollution control equipment and an assignment of "rental" payments under the "lease" of the property to the debtor. The debtor "leased" the equipment and the land from the IDB. The "lease" term was tied to the maturity and the retirement of the bond issue. The "rent" was payable to the bank and the debtor was obligated to purchase the system at the end of the "lease term" for a nominal consideration. That court cited substantial national authority, including authority in the Western District of Michigan, *In re Alpha Creamery Co.,* 4 U.C.C.Rep.Serv. 794, 797–98 (Bankr.W.D.Mich.1967), for the factors a court is to utilize when determining whether a contract is a true lease or is instead a disguised security arrangement. That court found, and this Court now finds, that such contracts are indeed poorly disguised security arrangements and not leases for purposes of § 365 of the Bankruptcy Code.

The bank has argued that the traditional factors utilized in making these determinations should not be applicable when the loan in question is of the EDC variety. It claims that Michigan law prohibited the EDC from entering into ordinary leases since Mich.Comp.Laws § 125.1607(d), Mich. Stat.Ann. § 5.3520(7)(d), which was in effect when this project was commenced in 1980, required that development corporations hold title to any project which they finance. That section then read as follows:

> In order to accomplish the public purposes set forth in section 2 the corporation may:
>
> ... (d) Enter into leases, lease purchase agreements, or installment sales contracts with any person, firm, or corporation for the use or sale of the project.

It also claims that No. 501 Public Acts of 1980 amended this statute to allow an EDC to obtain mortgages on the property instead of holding title. This section now reads:

> In order to accomplish the public purposes set forth in section 2 the corporation may:
>
> ... (e) Enter into leases, lease agreements, installment sales contracts or loan agreements with any person, firm, or corporation for the use or sale of the project.

Although given an opportunity to fully address this novel issue, the bank has failed to support its reading by any case law, legislative history or scholarly commentary. The debtor has submitted a supplemental memorandum in which it claims that the bank's argument misperceives the statute's powers and limitations. It says that the statute grants an EDC the power to enter into not only leases, but lease purchase agreements and that the Michigan legislature knew or should have known when it passed the law that there was a difference between a true lease and a disguised security arrangement, and that a court could deem the contract to be other than a lease. It acknowledged this by specifically permitting an EDC to enter into the hybrid "lease purchase contract". The argument seems logical: if all that was contemplated was a lease, there would have been no need for the terminology "lease purchase agreements", or "installment sales contracts". If a pure lease is looked at as one end of a continuum and sale is looked at as the other, then a "lease purchase" falls somewhere in between these two extremes. Since the legislature had authorized an EDC to enter into an installment sales contract, it must have contemplated that an EDC should be allowed to sell the projects outright, that is, not retain title.

The debtor also argues that the Internal Revenue Code provides a useful analogy. Rev.Rul. 68–590 (1968–2 C.B. 66) held that the corporation which was operating the project was the "owner" of the project for

federal tax purposes, and could not claim to be a mere lessee. That case also involved EDC-type financing and documentation substantially similar to the case at hand. The court stated:

> The substance of the agreements between the corporation and the political subdivision, when viewed in their entirety, is clearly that of a financing arrangement. The letter agreement, the contract to purchase, the lease agreement, an option to purchase and the trust indenture, although in the form of a sale and lease back (or a lease) are security devices for the protection of the bondholders who provided the financing for the project.

> The corporation has all of the burdens and benefits of ownership. The corporation is obligated to repay the principal costs of the project, plus interest in the form of basic rentals. It is also obligated to pay the normal cost of operating the project, plus the financing expenses in the form of additional rent. In the event of default, casualty or condemnation, the corporation has the same substantive rights and obligations as a mortgagor....

> It is clear that the parties intend legal title to the project to pass to the corporation. The political subdivision assumes no risk of loss regarding the project and has no opportunity of gain.

> Accordingly, the corporation is considered to be the owner of the project for federal tax purposes.

The court also matched the burdens to the benefits, holding that the corporation would be entitled to the investment tax credit and deductions for all ordinary and necessary expenses paid in the operation of the project, including the annual trustee fees, deduction for state and local taxes and depreciation. In other words, the IRS considered the political entity to possess none of the attributes of ownership.

Furthermore, the Michigan legislature obviously empowered the EDC's of this state to enter into what we call land contracts, since it specifically authorized the execution of "installment sales contracts". We have previously held that a land contract in Michigan, for purposes of the Bankruptcy Code, is a security interest in land, not an executory contract. *In re Britton*, 43 B.R. 605, 11 C.B.C.2d 1455 (Bankr.E.D.Mich.1984). It is likewise not a lease.

■ For all of these reasons, we conclude that the Lease Purchase Contract in question constitutes a security agreement giving the EDC an equitable mortgage in the real property and a security interest in the personalty of the debtor.[3] Since the Lease Purchase Contract was recorded in the records of the Saginaw County Register of Deeds, which is the appropriate place for filing mortgages, there is no question as to the perfection of the EDC's interest in the real property.

### (B) IS THIS NONRESIDENTIAL REAL PROPERTY

In order to avoid a remand if this case is successfully appealed on the first issue, we shall decide the remaining question of whether, if this contract is a lease after all, it is one concerning "nonresidential real property." The debtor says that so far there is no reported decision interpreting this provision of the 1984 amendments to the Bankruptcy Code.[4] It claims that legislative history supports its position that Independence Village is residential and that, therefore, § 365(d)(4) does not apply. It cites a comment by Senator Hatch with respect to the purpose for this amendment.

### SHOPPING CENTER BANKRUPTCY AMENDMENTS

Subtitle C of title III, with the exception of a few minor changes, is identical to S. 549 which was overwhelmingly ap-

---

**3.** No question has been raised about the security interest in the personalty.

**4.** Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub.L. No. 98–353, 98 Stat. 333 (1984).

proved by the committee and which unanimously passed the Senate in 1982 and 1983.

This subtitle contains three major substantive provisions which are intended to remedy serious problems caused shopping centers and their solvent tenants by the administration of the bankruptcy code.

The first problem which this bill would remedy is the long-term vacancy or partial operation of space by a bankrupt tenant. Although in a chapter 7 case the bankruptcy code presently requires that the trustee decide whether to assume or reject an unexpired lease within 60 days after the bankruptcy petition is filed, there is no deadline for this decision in a chapter 11 case. Because of the unprecedented number of bankruptcy cases and the consequent delays in the bankruptcy courts, tenant space has been vacated for extended periods of time before the bankruptcy court forced the trustee to decide whether to assume or reject the lease. During this time, the other tenants of the shopping center are hurt because of the reduced customer traffic in the shopping center. Tenants and landlords in *other nonresidential structures* have encountered similar problems.

The bill would lessen the problems caused by extended vacancies and partial operation of tenant space by requiring that the trustee decide whether to assume or reject nonresidential real property lease within 60 days after the order for relief in a case under any chapter. This time period could be extended by the court for cause, such as in exceptional cases involving large numbers of leases. One of the minor changes in this subtitle was to limit it to nonresidential real property leases. If the lease is not assumed or rejected within this 60-day period, or any additional period granted by the court, the lease is deemed rejected and the trustee must immediately surrender the property to the lessor.

130 Cong.Rec.S. 8894–95 (daily ed. June 29, 1984) (statement of Sen. Hatch) (emphasis added).[5] It argues that Independence Village is not the type of property that § 365(d)(4) envisioned. First, it says that as it is obvious that the premises are actually used as a residence for over 100 elderly individuals, it cannot be logically considered anything other than residential in nature. Second, it maintains that it is the character of the real property which is material to this inquiry, and not the relationship of the parties to the lease, to-wit: the statute speaks of a "lease of non-residential real property" not a "non-residential lease", and that, therefore, the mere fact that the debtor, a corporation, does not "reside" on the premises is immaterial.

The bank agrees that there is no precedent on this question. It claims that the purpose of excepting out residential real property from the effects of § 365(d)(4) was only to protect the debtor who was a lessee of residential property who uses it for his own personal or family use. The bank claims that it is the use to which the debtor or trustee puts the property that is the determining factor. Under this interpretation, a debtor who is a landlord of an apartment house that he himself rents from another may not claim the benefit of the residential use exception, it maintains. Finally, the bank argues that Congress did not intend to protect end-users of property by limiting the scope of § 365(d)(4) to nonresidential real property; rather, it intended to protect "landlords leasing real estate to commercial entities" by forcing an early resolution of whether the debtor's occupancy will continue.

■ We address the bank's arguments first. Its assertion that residential real property is an exception to the operation of

---

**5.** Senator Hatch commented further that the amendments also alleviate two other problems encountered by lessors of nonresidential property: the interruption of cash-flow when a debtor tenant stops paying rent while contemplating whether to assume or reject, and the upset of the mall's delicate tenant mix when the debtor or trustee assigns a lease to someone who will change the store's usage.

§ 365(d)(4) places the emphasis in the wrong place because it requires us to read that provision in isolation from the rest of § 365. The general rule in Chapter 11 (and Chapter 13) cases is that there is no 60-day deadline for the trustee or debtor in possession to assume or reject executory contracts and leases. The only exception in § 365 is for leases of nonresidential real property. In other words, it is § 365(d)(4) itself which is the exception. When the Code establishes both a rule and its exception, the exception should be construed narrowly. *See Lynch v. Johns-Manville Sales Corp.*, 710 F.2d 1194 (6th Cir.1983); *In re Fulghum Constr. Corp.*, 706 F.2d 171 (6th Cir.1983); *cert. denied,* — U.S. —, 104 S.Ct. 342, 78 L.Ed.2d 310. Although, read literally, that subsection is not limited to shopping centers, in light of the legislative history, we have serious doubts that the section was meant to apply to the instant "lease" and we thus see no reason to give as broad a reading to that term as the trustee advocates.

Even when read in isolation, we feel that the debtor's interpretation is better as a matter of pure grammatical construction. When the bank made the argument that Congress intended to protect "landlords leasing real property to commercial entities", it failed to give full effect to the descriptive term in question. Indeed, since the adjective "nonresidential" modifies the term "real property", it describes the type of *property* and not the type of *lease* which the debtor may have entered into with another. The statute says, in effect, that protection is afforded only to landlords who lease nonresidential real property. Thus the debtor's analysis squares better with the plain language of the statute. Since the lease in question deals with residential real property, that is, property in which human beings reside, § 365(d)(4) does not apply.

Finally, we feel that to the extent the statute is open to varying interpretations, an expression of Congressional intent, while by no means conclusive, should be influential. In this case, the statutory amendment was intended to protect landlords whose lessees occupy shopping centers or, arguably, it could be extended to situations where the lessee in fact leases the property to another commercial entity who uses that property for a business venture. There is no evidence whatsoever that Congress contemplated or intended the result which the bank proposes. Therefore, we hold in the alternative that if the transaction between the EDC and the debtor was and is a lease for the purposes of § 365 of the Code generally, then the property to which it pertains is not "nonresidential real property" as that term is used in § 365(d)(4). Accordingly, that lease would be governed by § 365(d)(2) wherein the trustee or debtor in possession may be compelled to assume or reject it only upon motion by a party in interest and subsequent court order.

## C. § 362(d)(2)—NO EQUITY; NOT NECESSARY FOR EFFECTIVE REORGANIZATION

The parties have stipulated that the debtor has no equity in the project. In fact, it is agreed that the secured debt on the property is approximately $15 million, and that the property is worth in the neighborhood of $3.0–5.5 million. Therefore, under § 362(d)(2), the only issue is whether the property is necessary for an effective reorganization. Inasmuch as it is the primary asset of the debtor, it is obvious that if there is to be any reorganization, the property in question would be essential in such a plan. The real question is whether the debtor has any likelihood of effectively reorganizing at all. The fight, then, is over the word "effective".

In the short life of this reorganization proceeding, the debtor has floated four trial balloons as to possible plans. It has suggested "condominiumizing" the project; changing the nature of the life-care contract from a life-lease with initial endowment to a rental program and then bootstrapping; selling the project to some other entity with the debtor being hired to provide the services to the residents; and fi-

nally, simply liquidating the facility. The bank's most vociferous arguments have been directed narrowly to the first and the fourth alternatives.

Addressing the last alternative first, the bank argues that the term "effective reorganization" in § 362(d)(2)(B) does not include liquidation. It cites no authority for this proposition. Instead, it points to a comment by Professor Frank Kennedy, one of the drafters of the Bankruptcy Code, contained in a law review article and *In re Terra Mar Associates*, 3 B.R. 462, 6 B.C.D. 150, 153 (Bankr.D.Conn.1980), which cited it, for the general proposition that when the debtor has no equity in a particular property, the debtor's mere "hope of rehabilitation is not enough, of course, to justify the continuation of the stay when rehabilitation is hopeless or the stay threatens injury to the lienor's security." Kennedy, *The Automatic Stay In Bankruptcy*, 11 U.Mich.J.L.Ref. 179, 244 (1978). *Terra Mar* is merely an exercise in fact-finding. There, the judge determined from the evidence before him, that there was no likelihood of any reorganization, including a sale of the property, within a reasonable time, and so lifted the stay. The comment by Professor Kennedy is indisputable, but of little help. The prospect of liquidation as a plan of reorganization simply is not discussed.

■ The debtor has cited these cases for the proposition that "effective reorganization" includes liquidation: *In re W.S. Sheppley & Co.*, 45 B.R. 473, 12 B.C.D. 709 (Bankr.N.D.Iowa 1984); *In re Shriver*, 33 B.R. 176, 11 B.C.D. 93 (Bankr.N.D.Ohio 1983); *In re Saypol*, 31 B.R. 796, 10 B.C.D. 1057 (Bankr.S.D.N.Y.1983); *In re Koopmans*, 22 B.R. 395, 9 B.C.D. 514, 6 C.B. C.2d 1414 (Bankr.D.Utah 1982). It principally relies on Judge Mabey's exhaustive analysis in *Koopmans*.[6] Judge Thinnes, in both *In re Keller*, 45 B.R. 469 (Bankr.N.D. Iowa 1984) and *In re W.S. Sheppley & Co.*,

*supra*, adopted the reasoning and holding of *Koopmans*. Neither *Shriver* nor *Saypol* is authority for the proposition for which it is cited. We are persuaded by the reasoning of *In re Koopmans, supra*, and therefore hold that even a plan of complete liquidation of the facility pursuant to 11 U.S.C. § 1123(b)(4) may be an "effective" reorganization for purposes of § 362(d)(2)(B).

■ However, the debtor does not propose complete liquidation—at least not yet. It has considered marketing the facility as condominiums.[7] The bank claims that such a proposal could not lead to an "effective" reorganization because a plan containing it could not be confirmed. It stated that to convert the facility into condominiums would violate the debtor's "use of project" covenant contained in § 4.2 of the contract. It argues that the debtor seeks to gain the benefits of the contract without performing its obligations and that we ought not allow it to do so. If we had held that the Lease Purchase Contract established a true lease, the argument would be sound, as one who assumes a lease or executory contract assumes it *cum onere*. *In re Ashley*, 41 B.R. 67, 71, 11 C.B.C.2d 822, 827 (Bankr.E.D. Mich.1984). However, the contract does not create a lease; instead it is a security agreement as to the personalty, and a mortgage as to the realty of the facility. One does not "assume" a mortgage or security agreement, and undoubtedly the debtor has not done so here. The debtor was in material breach of several of the covenants of the contract before it filed Chapter 11, and is breaching one or more covenants every day it exists. That a proposed plan of reorganization may cause a breach of another covenant is insignificant. If the plan otherwise meets the standards of confirmation under § 1129 of the Bankruptcy Code, the mere fact that the plan "impair[s] ... [a] class of claims, secured or unsecured ...", 11 U.S.C. § 1123(b)(1)

---

**6.** Precisely because it is exhaustive, to recite it here would be impractical.

**7.** At the hearing of this motion, the debtor made little mention of this possibility, although it was one given a high priority at the inception of the case.

does not make that plan of reorganization ineffective. Indeed, it is the very effectiveness of the proposed reorganization that produces the most objection by the impaired class or classes. Thus, a plan to convert the facility into condominiums would not, for that reason alone, be an ineffective reorganization.

Since an unconditional liquidation may be an effective reorganization, it follows logically that a plan to liquidate the premises but retain a right to service the residents for a fee could likewise be an effective plan of reorganization.[8]

The debtor explained an embryonic bootstrap plan in the course of the hearing through testimony of James Leich, a market analyst, and Judith Berkley, a C.P.A. and financial analyst, both of Dixon & Associates (a firm specializing in market research for health care and retirement facilities), James McTevia (the person designated by the debtor to be its responsible officer in these proceedings), and Roy Sefton (a C.P.A. and the former comptroller of the debtor). The debtor showed that the experts blame its financial failure on two factors: economic factors beyond its control, which are now largely behind it; and poor management practices and decisions, which can be corrected. Independence Village promises elderly people lifetime care in return for a substantial endowment upon entrance. When the project was initially established, it was theorized that the elderly would obtain the endowment fee by selling their homes, which are usually debt-free and too large for their needs and use these proceeds as their endowment. Unfortunately, according to Mr. Leich, the project came on-line at the worst possible time and place—in 1982 in mid-Michigan. The severe recession this area suffered, together with extremely high interest rates, made it virtually impossible for the elderly (or anybody else) to sell their homes. As a result, the debtor's customer base was without the financial wherewithal to purchase the product. The high interest rates also led to a delay in financing, which increased initial expenses. The debtor's management was faulted for building a facility too large for the market area, for a destabilizing turnover of marketing firms, for poor advertising and follow-up, and for offering an inadequate service package. Finally, publicity regarding the facility's financial problems probably dampened sales and led to cancellations. While revenues were stuck at start-up levels, the fixed costs, which greatly exceeded revenue, continued. Eventually the debtor defaulted on interest payments due the bondholders, leading inexorably to this Chapter 11.

Dixon & Associates did a marketing study for the debtor in the fall of 1984. The report identified the aforementioned deficiencies, studied the debtor's primary and secondary market areas, the growth expected within each of these, evaluated the competition, calculated the debtor's target market, its market penetration, and a reasonable expectation of growth rate based upon the debtor following the firm's marketing suggestions. These suggestions included adjusting its life-care package, marketing it as a refundable sale program instead of an endowment program, and instituting improved advertising and promotion practices. It also suggested that efforts be made to obtain sufficient nursing home beds to guarantee availability to prospective residents.

If the debtor followed these suggestions, Dixon & Associates projected that the debtor could expect to obtain an average of three net sales per month until functional capacity is reached in 1988. The marketing study concluded, however, that without a substantial increase in monthly fees, which were not factored into its equation, "even when operating at functional capacity, operating losses will continue and such operating losses could be material." Page 4 of Report.

Mr. Sefton, the debtor's former comptroller, testified that he prepared computations

---

**8.** This proposal, too, was given short shrift by the debtor at the hearing. It seems to be a fallback position if the debtor's primary plan proves unworkable.

using a rental program instead of Dixon & Associates' suggested refundable sale program. Using solely a cost approach, he determined that in order to yield the same revenues as the debtor's current life care program, the weighted average rental for a unit at Independence Village "ought to be" $906 per month. Mr. McTevia testified that he had already signed nine new rentals in the four months he had been with the debtor, that advertising for rentals had commenced and would continue, that the monthly rental rates for apartments were $650.00 for a studio, $775.00 for a one bedroom, $995.00 for a two bedroom, and $1,125.00 for a two bedroom "stretch". Mr. Sefton explained that these rates do yield a weighted average unit rental of $895.00. Mr. McTevia also testified as to the cost savings he had effected. Notwithstanding all of that, the facility is still, at best, barely breaking even.

Ms. Berkley prepared and testified about a financial projection, in which the revenue side was based on Mr. Sefton's rental program, not Dixon & Associates' suggested refundable sale program. On the expense side, however, she based her projected expenses on the debtor's past history as a facility selling an endowment program. Thus, it appears that the cash flow projections are conceptually flawed.

The debtor argues that based on its experts' studies and projections, reorganization is within the realm of possibility if the debtor takes certain steps. However, the debtor's own witnesses showed that the debtor is not following its experts' advice, but is instead moving ahead with a rental program. Mr. Leich did say that for a home care facility in Chapter 11, rentals may be simpler to market than sales, since the elderly may not wish to risk the substantial upfront cash outlay required by a sale program. However, the facts elicited simply don't mesh with the experts' opinions.

Mr. Leich's suggestions were based upon marketing "product A" (a full refund sale program), while the debtor is strongly indicating that it will instead market "product

B" (a straight rental program). Ms. Berkley testified that she was told by Mr. Sefton to assume that the facility will obtain average new net *rentals* over the course of the projections of three units per month, and the only basis he had for this assumption was that Mr. Leich's report indicated net *sales* of three per month if the facility followed his recommendations. Thus, there is no foundation on which to safely assume that the facility will obtain an average of three net rentals per month. Furthermore, Mr. Sefton, a C.P.A., testified that his rental schedule was based strictly on the *cost* of the apartment; i.e., he computed what it would take in rental price to roughly equal the amount the facility would have obtained had it sold the particular apartment. This cost analysis yielded a price for a studio, for example, of $906.00 per month, reduced to $895.00 to make it attractive to the gullible. It is entirely speculative, however, whether the apartments are marketable at the weighted average rental "price" of $895.00.

In short, the debtor's proofs on the issue of the likelihood of proposing a plan of effective reorganization are a jumble, and they fail to instill in the Court any firm conviction that any of the suggested modes of reorganization will be successful. As the debtor bears the burden of proof on this issue, 11 U.S.C. § 362(g)(2), such a deficiency might be fatal to its cause. However,

> [i]n the early stages of a bankruptcy case, a court should balance the interests of the secured creditor against the congressional policy favoring reorganization. The court should be hesitant to find no reasonable possibility of reorganization, especially where the debtor has not had sufficient time to formulate a plan.

*In re Hollie,* 42 B.R. 111, 118 (Bankr.M.D. Ga.1984); *In re Heatron, Inc.,* 6 B.R. 493, 6 B.C.D. 1008 (Bankr.W.D.Mo.1980). The motion here was filed on the 61st day of the case, and tried on the 99th day. This is a complex case involving over $14 million in debt, millions of dollars in assets, over

1,000 creditors, and the substantial interest of over 100 elderly residents. We agree with the above-cited cases that "[a]t the beginning of the reorganization process, the Court must work with less evidence than might be desirable and should resolve issues in favor of the reorganization, where the evidence is conflicting." *In re A & B Heating & Air Conditioning, Inc.*, 48 B.R. 401, 403–404 (Bankr.M.D.Fla.1985), *quoting In re Heatron, Inc.*, 6 B.R. at 496, 6 B.C.D. at 1010. Therefore, "[h]aving reviewed the evidence and given the early stage of the proceedings at which the Motion to Lift the Stay has been filed, the Court concludes that the likelihood of reorganization is good although the form of reorganization at this time is not entirely clear." *In re W.S. Sheppley & Co.*, 45 B.R. at 480–481, 12 B.C.D. at 713.

We make this finding despite the bank's strenuous argument that a facility so totally under water as Independence Village has no hope of reorganization. That argument is unpersuasive. Independence Village, Inc. is a non-profit corporation. It has no shareholders, hence there are no interests inferior to the unsecured creditors. Thus there should be little difficulty with the absolute priority rule of § 1129(b)(2)(B)(ii); *compare In re Genesee Cement, Inc.*, 31 B.R. 442, 10 B.C.D. 1212 (Bankr.E.D.Mich. 1983). Thus a severe cramdown of unsecured debt may not be an insurmountable problem in a plan of reorganization. Consequently, the fact that the bank may possess as much as an $11 million unsecured claim due to the insufficiency of the value of its collateral should not pose an undue burden upon the reorganization process. It merely means that the bondholders may suffer a substantial loss in a crammed down plan. To be sure, such a fact may be unpleasant to the bondholders, but it does not detract from the "effectiveness" of such a plan. A reorganization does not have to be attractive to be effective.

For all of these reasons, we are unable to say at this early juncture that the debtor is unable to propose a plan of effective reorganization. This is not to say, of course, that if the proofs submitted on this motion were repeated a year from now on a renewed motion for relief from the stay or for dismissal under § 1112(b)(1) that the Court would be willing to view the evidence quite as favorably to the debtor. The corollary to the leniency a court exercises at the inception of the case is the strictness with which it reads the proofs as the case matures. Thus, the debtor is strongly encouraged to make progress toward proposing a plan of reorganization, be it a rental bootstrap, a full refundable sale program bootstrap, "condominiumizing", a liquidation with strings attached, or straight liquidation. *Cf. Grundy Nat'l Bank v. Tandem Mining Corp.*, 754 F.2d 1436, 1440 (4th Cir.1985).

### D. § 362(d)(1)—CAUSE: ADEQUATE PROTECTION

The principal dispute in this case is whether the debtor has offered the bondholders adequate protection of their secured interest in the premises. The bank urges the Court to apply the analysis of the Ninth Circuit Court of Appeals in *In re American Mariner Industries, Inc.*, 734 F.2d 426 (9th Cir.1984). It claims that the value of its interest in the collateral includes the amount of interest it could earn on the proceeds of a timely liquidation of its collateral but for the imposition of the automatic stay. Therefore, payments by the debtor, or any other form of adequate protection provided by the debtor, must protect the bondholders against not only depreciation of the property but also the loss of interest they would have earned but for the automatic stay.

The debtor asks us to disregard *American Mariner*, as "contrary to congressional intent", and analyze the issue in the classic method found in *In re South Village, Inc.*, 25 B.R. 987, 9 B.C.D. 1332, 8 C.B.C.2d 42 (Bankr.D.Utah 1982) and *In re Pine Lake Village Apartment Co.*, 19 B.R. 819, 8 B.C.D. 1402, 6 C.B.C.2d 713 (Bankr. S.D.N.Y.1982). Under that analysis, the value of the right to foreclose immediately is not protectable under § 361 and § 362 of the Code. Furthermore, it argues, even if

the Court were to follow *American Mariner*, the debtor has indeed offered adequate protection of the bondholders' interest in the property.

Although this Court is not bound by the holding of a court of appeals of a circuit other than the Sixth Circuit, it may be persuaded by its reasoning. *Timmreck v. United States*, 577 F.2d 372, 374 (6th Cir. 1978) n. 6, *rev'd on other grounds*, 441 U.S. 780, 99 S.Ct. 2085, 60 L.Ed.2d 634 (1979); 1B J. Moore, *Federal Practice* ¶ 0.402[1], at p. 14–16 (2d ed. 1948). *American Mariner* has been followed by courts in these reported decisions: *In re Martin*, 761 F.2d 472 (8th Cir.1985); *Grundy Nat'l Bank v. Tandem Mining Corp., supra; First Bank of Miller v. Wieseler*, 45 B.R. 871, 12 B.C.D. 900 (D.S.D.1985); *In re Levine*, 45 B.R. 333 (N.D.Ill.1984); *In re Bear Creek Ministorage, Inc.*, 49 B.R. 454, 12 B.C.D. 1337, 12 C.B.C.2d 1098 (Bankr.S.D. Tex.1985); *In re Alexander*, 48 B.R. 110 (Bankr.W.D.Mo.1985); *In re Air Vermont, Inc.*, 45 B.R. 931, 12 B.C.D. 1130, 12 C.B. C.2d 547 (Bankr.D.Vt.1985); *In re Colrud*, 45 B.R. 169, 12 B.C.D. 672 (Bankr.D.Alas. 1984); *In re Mary Harpley Builder, Inc.*, 44 B.R. 151 (Bankr.N.D.Ohio 1984); *In re Cassavaugh*, 44 B.R. 726, 11 C.B.C.2d 1181 (Bankr.W.D.Mo.1984); *In re Nordyke*, 43 B.R. 856 (Bankr.D.Ore.1984); *cf. In re Monnier Bros.*, 755 F.2d 1336, 1339 (8th Cir.1985). It has been rejected in these reported decisions: *In re Keller, supra; In re W.S. Sheppley and Co., supra; In re Manville Forest Products Corp.*, 43 B.R. 293, 11 C.B.C.2d 735 (Bankr.S.D.N.Y.1984). In an as yet unreported decision, Judge Rhodes of this district followed *American Mariner. In re Vanas*, 50 B.R. 988 (Bankr.E.D.Mich.1985). We are persuaded that the Ninth Circuit's opinion in *American Mariner* correctly states the law of adequate protection. The challenge is in its application to the facts of each case.

The facts here fit the classic mold: the movant is a creditor possessing a secured claim, and, as a consequence of the insufficiency of its collateral, a substantial unsecured claim in this case. 11 U.S.C. § 506(a). The first step in the analysis is to determine the value of each claim. *In re Martin, supra.* The parties stipulated to the admission of an appraisal report which concluded that the property had a "fair market value" of $5.5 million. Thomas P. Williams, M.A.I., testified in support of his appraisal that "fair market value" includes within its definition the allowance of a sufficient period of time for the property to be properly marketed. Each type of property has its own period of reasonableness for marketing purposes. For example, an average residential property need not be marketed nearly as long as a specialty industrial property. In this case, Mr. Williams testified that Independence Village is a highly specialized property with few potential buyers, and therefore, a relatively lengthy period of time would be necessary to properly market it. Although he could not be pinned down, it was his opinion that a minimum of one year would be reasonable to test the market. Mr. Williams defined "liquidation value" as the most probable forced selling price paid in cash. Because the seller has external compulsion to sell and the buyer has no such compulsion to buy, the liquidation value is always lower than fair market value; in this case, he discounted market value by 45% and determined that liquidation value of this property is $3 million.

The question which frequently arises in valuing a secured claim, that is, whether the court utilizes liquidation value or going concern value, arises here. Valuation "shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest." § 506(a). In our opinion, *In re Bear Creek Ministorage, Inc., supra*, is the best practical guide to determining the standard of value when applying the *American Mariner* construct.

Because the statute protects the creditor's right to investment return on foreclosure proceeds, the protected payments should be a function of the price that could be realized on foreclosure times the

rate of return the creditor could expect on reinvestment of the foreclosure proceeds. Thus the Court must determine the amount that would be realized on foreclosure, the rate of return on the proceeds, and the date when foreclosure would occur and investment return would begin. Obviously, none of these facts is susceptible of determination with mathematical precision.

The amount realized on foreclosure is difficult to determine both because it is difficult to determine the market in which the property will sell and because the evidence of prices available in each market consists of estimates and appraisals. Should the Court use the price that the property would bring at an auction or should the Court also consider the secured creditor's right to "buy in" the property at foreclosure and ultimately to realize a greater benefit through prudent delayed marketing of the property utilizing a more efficient market plan? In most cases, the former would bring a lesser price more quickly while the latter would bring a greater price somewhat later. The evidence in different cases might result in different determinations of what plan a prudent creditor might adopt.

The *ratio decidendi* of *American Mariner* is that the creditor has a right to protection of the present value of its right to foreclose and to reinvest the sale proceeds. To compute that present value, this Court assumes that the creditor would act as a prudent businessman and would follow reasonable, established marketing techniques, including purchasing the security itself at foreclosure in partial or full satisfaction of the indebtedness, followed by a reasonable and prudent effort to market the property. Since the creditor's right to foreclose would give it no financial benefit until the final sale to a third party of the property acquired at foreclosure, the payments by the debtor need not begin until that date in order to preserve the present value of the creditor's right to foreclose and to reinvest the proceeds.

*Id.,* 49 B.R. at 457, 12 B.C.D. at 1338, 12 C.B.C.2d at 1101–1102. In theory, we agree wholeheartedly with this logic. Furthermore, since the debtor's use of the property is as an ongoing business enterprise, it should not be permitted to "eat with the hounds and run with the hares". *In re Crockett,* 3 B.R. 365, 367, 6 B.C.D. 226, 227, 1 C.B.C.2d 926, 928 (Bankr.N.D. Ill.1980); *quoted in In re Frost,* 47 B.R. 961, 12 C.B.C.2d 990, 993 (D.Kans.1985). Therefore, *for these purposes,* 11 U.S.C. § 506(a), we would have found that the value of the property, and therefore the secured claim of the bondholders, is $5.5 million. However, in its closing argument, the bank impeached this valuation and asked us to reject it as factually unsupportable.[9] Therefore, we find the value of the

---

9. In the closing arguments, counsel for the bank stated:

> We believe that if the debtor's going to be allowed to continue to take advantage of the automatic stay if this Court found that the automatic stay should stay in place, that under the *American Mariner* case, we're entitled to compensation for the delay. And the compensation should be paid now. And I would agree that it shouldn't be paid on a high value, a fair market value. But we have put into evidence the liquidation value of the facility as determined on a set of facts—the best set of facts that was presented to the Court. And that liquidation value is 3 million dollars.
>
> If one were to believe the debtor's revised figures, that is the increased stream of income based on he [sic] so-called lease program, then that would merely increase the amount

of the liquidation value, and it would increase the money—amount of money we should be entitled to. We believe, however, that the Defendant's Exhibit # 3 [the financial projections] is entirely without foundation, and must be disregarded by the Court since there was no testimony of anybody stating that they believed that the facility could meet those income projections.

(Tr. at 65). Counsel went on to state further that:

> Well, *American Mariner* put it that we are entitled to what we could have gotten on a liquidation—I understood it to mean today. One could argue—if I were foreclosing today, and if I were—if I started today, I would know that in a certain period of time, I would be able to transfer title, and I could negotiate to transfer title. I think the expert testified that it would take several months to over a

property and hence the secured claim of the bondholders *for these purposes* to be $3 million.

The next step in the analysis is to identify the risks to the secured creditor's value resulting from the debtor's continued use of the property, *In re Martin, supra;* in short, whether the property is physically depreciating, and if so, at what rate. The testimony on this point was brief as this issue was not seriously in contest. The Court finds that the property is not physically depreciating and that it is adequately insured. Thus the risk to the bondholders' value arising from the debtor's use of the facility is *de minimis.*

The third step is to determine how much, if anything, the bondholders could be earning but for the automatic stay preventing them from promptly liquidating their collateral. *In re Bear Creek Ministorage, Inc., supra.* On this point, there is much dispute. The debtor argues that the automatic stay is not preventing the bondholders from realizing their collateral, but that economic realities are. They claim that even if, instead of the bankruptcy petition, a foreclosure suit had been commenced on February 1, 1985, the bondholders would still have nothing to reinvest since the property is, as a practical matter, unmarketable. Thus, if the property were sold at a foreclosure sale, and the bank bid in the bondholders' interest it would receive nothing but title to an unmarketable property. Since this title would yield them nothing in terms of income, the debtor argues that the bankruptcy stay is likewise depriving them of nothing of value.

While this analysis is facially consistent with *American Mariner,* we cannot accept it because it goes too far. Taken to its logical extreme, the argument would lead us to the absurd conclusion that the debtor may take all the time it wants to pursue confirmation of a plan of reorganization without providing the bondholders any protection other than continued maintenance and insurance on the facility. That result is simply untenable and is inconsistent with *American Mariner.* Although Mr. Williams testified that the property, marketed in the normal manner, could be sold for $5.5 million, that does *not* mean that it would be unmarketable if sold immediately; instead, he estimated that the project could be sold more quickly, i.e., liquidated, for $3 million. In other words, were the bank allowed to foreclose, it could expect to receive $3 million at the sale. That constitutes a realizable interest which the bondholders, but for the commencement of this case, could collect, and for which they are entitled to adequate protection.

Foreclosure by judgment takes 7½ months to complete.[10] That is when the bank could bid in the $14 million mortgage debt and therefore when the bank would obtain title to the property enabling it to attempt to market it. The next question is when that 7½ month period should be deemed to commence: is it from the filing of the motion for relief from the stay or is it from the date of filing of the petition for relief? Despite authority to the contrary, *Grundy Nat'l Bank v. Tandem Mining Corp., supra,* 754 F.2d at 1441, we believe Judge Steen's analysis in *In re Bear Creek Ministorage, Inc.* is more faithful to *American Mariner. American Mariner* stated that a secured creditor "is entitled to compensation in enforcing its rights during the interim between the petition and confirmation of the plan." *Id.,* 734 F.2d at 435. We agree with Judge Steen that "the petition"

year to get fair market value. I think it's fair to assume that within a year, we could certainly find somebody to buy it at liquidation value.
(Tr. at 69).

**10.** In oral argument the bank indicated that it would not foreclose by advertisement but would instead utilize judicial foreclosure, Mich.Comp. Laws § 600.3101–3180; Mich.Stat.Ann. § 27A.3101–3180. Pursuant to Mich.Comp.

Laws § 600.3115, Mich.Stat.Ann. § 27A.3115, the judge may not set the date of sale less than 6 months after the commencement of the foreclosure case, and notice of the sale, for at least 42 days, Mich.Comp.Laws §§ 600.6052, 6091, Mich.Stat.Ann. §§ 27A.6052, 6091 cannot begin until the 6 month period has expired. *See* Cameron, *Michigan Real Property Law,* § 18.90, 654 (ICLE, 1985).

referred to there means the "petition for relief" by or against the debtor, and not the filing of the creditor's motion for relief from the stay. *In re Bear Creek Ministorage, Inc., supra*, at n. 11. We also agree with his analysis attempting to harmonize *Grundy* with *American Mariner:*

> If *Grundy* means that adequate protection *payments* may not begin until after a motion for § 362(d) relief is filed even though the applicable delays are calculated from the date of the petition, then the result is reasonable; that limitation would prevent hardship to the debtor caused by a "late" § 362 motion that could require sizable "make-up" payments for which the debtor had not planned. It is not unreasonable to require the creditor to be vigilant in requesting protection if it wants protection.

*Id.* This construction, we feel, honors the creditor's right to receive its indubitable equivalent without requiring the debtor to anticipate a contingency that may never occur.

In *In re Bear Creek Ministorage, Inc.*, the court also held that adequate protection payments need not even commence until the date the property could be expected to be sold to an end purchaser. It noted that if the reorganization failed of its purpose, this delay would prejudice the secured creditor because the foreclosure delay period would run twice—once while stayed by the bankruptcy, and once again when the stay is lifted and foreclosure commences for real. *Id.* at n. 9. However, it read *American Mariner* as acknowledging and accepting this risk in a philanthropic gesture to "promote reorganization". We believe that this misreads *American Mariner*. In footnote 12, the Ninth Circuit Court of Appeals stated that "to avoid overcompensating the secured creditor, the timing of adequate protection should take account of the usual time and expense involved in repossession and sale of collateral." The court in *In re Bear Creek Ministorage, Inc.* read the words "the timing of adequate protection" to mean the time that *payments* to adequately protect the creditor's claim commences. However,

the Court of Appeals cited footnote 14 of *In re South Village, Inc., supra* to explain its context. In that footnote, Judge Mabey said: "Opportunity cost as adequate protection may be difficult to reconcile with *the timing as well as the method of valuation.*" (Emphasis added). This is the topic sentence of the paragraph, and the balance of the paragraph addresses the question of whether the court is to value the property as of the date of the petition for relief or as of the date the creditor, absent the stay, could first liquidate the collateral. We interpret that sentence in *South Village* to mean: "Opportunity cost as adequate protection may be difficult to reconcile with *the timing of valuation* as well as the method of valuation", and we believe the court in *American Mariner* did so as well. Thus, *American Mariner* does not stand for the proposition that when a court determines that a creditor will not, even absent the stay, obtain the proceeds of sale of its collateral until some time in the future, that adequate protection need not be provided until that day arrives. Instead, adequate protection must be provided throughout the case. Therefore, the "flaw" identified in footnote 9 of *In re Bear Creek Ministorage, Inc.* in "the *American Mariner* solution" is no flaw at all as "the *American Mariner* solution" contemplates no such postponement in the commencement of adequate protection. Indeed, a postponement would contradict *American Mariner's* ultimate holding:

> We hold that Crocker National Bank is entitled to compensation for the delay in enforcing its rights during the interim between the petition and confirmation of the plan. Crocker contended that such compensation should take the form of monthly interest payments at the market rate on a liquidation value of the collateral. We agree that this is one method of providing adequate protection but by no means the only method available to the debtor. Consistent with the policies behind §§ 361 and 362, the debtor should be permitted maximum flexibility in structuring a proposal for adequate pro-

tection. *The result, however, should as nearly as possible under the circumstances of the case provide the creditor with the value of his bargained for rights.*

*In re American Mariner Industries, Inc., supra*, 734 F.2d at 435 (Emphasis added; footnotes omitted). For a court to postpone them would, whenever the reorganization turns out to be unsuccessful, be to deprive a secured creditor of these rights. That result would be antithetical to the spirit and holding of *American Mariner. See In re Martin, supra*, 761 F.2d at 476 ("This flexibility, however, must not operate to the detriment of the secured creditor's interest.")

 Thus, we hold as follows: The bondholders are entitled to adequate protection for the investment value of the $3 million they would be able to obtain at a foreclosure of the facility during the period between the filing of the Chapter 11 case and the earliest possible foreclosure date of September 15, 1985; however, because the motion for relief from the stay was not filed until April 4, 1985, two months after the petition was filed, the bank is entitled to protection only from that date.[11]

It remains to be determined what rate of interest would fairly compensate the bondholders during the period that they are denied the opportunity to foreclose on the property. The bonds carry various rates of interest between 10% and 12¼%, depending upon the maturity dates. All interest is exempt from taxation. (Mortgage and Trust Indenture, p. 1, 10).[12] However drastically ordinary interest rates may have declined since the bonds were issued in 1980, the current market rate for the average tax-free investment of this sort is still approximately 11%.[13] We find that to be the appropriate rate here. Applying this rate to the value of $3 million results in an annual income foregone by the bondholders of $330,000, or $27,500 per month. This is the lost opportunity cost which the debtor must adequately protect.

The bank argues that *American Mariner* requires the debtor to make periodic

**11.** It is fairly obvious that the bank deliberately waited until the case was more than 60 days old before filing the instant motion, as that allowed it to make the additional claim that § 365(d)(4) terminated the lease. By doing so, the bank had the ability to argue that it was entitled to possession as a consequence of the debtor's failure to assume the lease. The result we reach here is the down-side of that strategy.

**12.** We recognize that the tax-free status of the interest enhances the real return to the bondholders. If the bondholders are in the 50% tax bracket, then the bonds yield the equivalent of a 20% to 24½% return, if the income were taxed. If the debtor's bankruptcy proceeding or reorganization causes the bonds to lose exempt status, it could be argued that a higher interest rate is necessary. However, the issue was not argued by the parties and we decline to rule on it.

**13.** Since no evidence as to market interest rates was offered by any party, the Court has taken notice of such rates by reviewing publications such as the *Wall Street Journal* and *Business Week.* The *Wall Street Journal,* August 30, 1985, at 17, col. 6 lists the current market rates of interest on various types of tax-free investment grade municipal bonds. The type closest to those involved in this case appears to be hospital bonds. These are currently yielding an average of 9.57% tax-free interest per annum to their

holders. *Business Week,* September 2, 1985, at 95, lists the current average yield on investment grade municipal bonds as 9.12%. However, these charts rate investment grade securities, whose liquidity is likely greater and whose risk is likely lower than the bonds sold to finance Independent Village.

Although we believe this entire exercise is improper since the issue is one of fact which should be the matter of proofs, the Court of Appeals for this circuit apparently disagrees. It stated in *Memphis Bank & Trust Co. v. Whitman,* 692 F.2d 427, 431 (6th Cir.1982) that when deciding the proper rate at which a secured claim should bear interest, the bankruptcy court should neither automatically fix the contract rate (when the creditor is not fully secured) nor an arbitrary rate, but

> [t]hat in the absence of special circumstances bankruptcy courts should use the current market rate of interest used for similar loans in the region. Bankruptcy courts are generally familiar with the current conventional rates on various types of consumer loans. And where parties dispute the question, proof can easily be adduced.

We understand this comment to impose a requirement on bankruptcy judges to either keep current on market rates of interest or to do independent research on the topic whenever the issue arises. We took the latter course.

payments. As the above quotation makes clear, this is incorrect. However, whatever form the debtor's proposal takes, the result must adequately protect the creditor's interest in the property, as that term has been so excruciatingly defined.

Here, the debtor's package appears on first blush to meet that requirement. The debtor's amended proposal for adequate protection states as follows:

1. The Debtor-In-Possession will give to the Trustee [meaning the bank] or bondholders' committee the right to list the facility known as "Independence Village" for sale with a national broker. The debtor is willing to give up complete control of sale of the facility with only the restrictions which are outlined below.

2. During the first thirteen months following entry of the adequate protection order, the debtor in possession agrees that it will not object to a sale of the facility for a price of $5.5 million or more. The debtor in possession would propose a plan at the trustee's request for such a sale.

3. After the expiration of 13 months from the date of entry of the adequate protection order, the debtor agrees to sell the facility to any purchaser which the trustee and the bondholders locate for any price. The debtor in possession would have the option to continue to seek refinancing or alternative sources of financing during the course of this Chapter 11 proceeding, however, if the trustee or bondholders locate a purchaser in excess of $5.5 million during the first 13 months or for any price after that initial 13 month period, to whom they wish to sell the facility, the debtor in possession will not object to the sale and will bring the plan before the Court if the trustee or bondholders so request.

4. In the event an order converting or dismissing the case is entered by the Court at any time, a deed in lieu of foreclosure will transfer to the trustee. Upon entry of an adequate protection order encompassing the terms outlined in this proposal, this deed will be placed in escrow with an agent to be determined by the Court and released to the trustee upon entry of an order dismissing or converting this case.

5. In the event a deed in lieu of foreclosure is transferred to the trustee, a valuation hearing will be held to determine the value of the facility at that time to determine the credit to be granted against the outstanding indebtedness. Lutheran Homes of Michigan as guarantor of the bond shall participate in that hearing as a party in interest.

Thus it appears that the debtor is literally "putting its money where its mouth is" in that it is giving the secured creditor the freedom to market the facility at the present time notwithstanding the automatic stay.

However, the bank worries that the proposal for adequate protection fails for legal and practical reasons even though it may be a good faith, though novel, attempt. This fear is born out of a legitimate insecurity as to the residents' status. If the residents are tenants of the debtor, they may have the right to remain in possession of the premises notwithstanding the debtor in possession's sale thereof. A sale may include the debtor's assumption of the "leases" [14] of the residents, and therefore the purchaser would be subject to their rights. *Plaza Investment Co. v. Abel*, 8 Mich.App. 19, 153 N.W.2d 379 (1967), 15 M.L.P. *Landlord & Tenant* § 133, 260 (1957). On the other hand, the debtor might wish to reject these "leases" to make the property more saleable. However, § 365(h) and (i) [15] would allow the residents

---

14. Neither party proffered evidence of any written document which expresses the rights of the residents. Therefore, the Court is simply unaware of whether the residents executed "leases", or some other documents evidencing a right to possess the premises.

15. Section 365(h) and (i) read as follows:
(h)(1) If the trustee rejects an unexpired lease of real property of the debtor under which the debtor is the lessor, or a timeshare interest under a timeshare plan under which the debtor is the timeshare interest seller, the lessee or timeshare interest purchaser under such lease

to retain possession notwithstanding the rejection by the debtor. On the other hand, the residents might be deemed to be the owners of a fee interest in real estate, since they, in effect, may have life estates determined by their own lives. A life estate may be created either by express grant, or by implication, including by way of a lease. 31 C.J.S. *Estates*, § 32 (West, 1964). Under this circumstance, the debtor argues that it has the power to sell the property pursuant to § 363(f),[16] free and clear of their interests. Alternatively, the debtor might utilize § 363(h),[17] which permits it to sell not only the estate's interest but also the interest of certain types of co-owners. However, the latter subsection does not authorize sale of the interests of life tenants and the debtor is not a "tenant in common, joint tenant, or tenant by the entirety" of the premises; it is instead, under this hypothetical analysis, a remainderman with respect to those units in which the

or timeshare plan may treat such lease or timeshare plan as terminated by such rejection, where the disaffirmance by the trustee amounts to such a breach as would entitle the lessee or timeshare interest purchaser to treat such lease as terminated by virtue of its own terms, applicable nonbankruptcy law, or other agreements the lessee or timeshare interest purchaser has made with other parties; or, in the alternative, the lessee or timeshare interest purchaser may remain in possession of the leasehold or timeshare interest under any lease or timeshare plan the term of which has commenced for the balance of such term and for any renewal or extension of such term that is enforceable by such lessee or timeshare interest purchaser under applicable nonbankruptcy law.

(2) If such lessee or timeshare interest purchaser remains in possession as provided in paragraph (1) of this subsection, such lessee or timeshare interest purchaser may offset against the rent reserved under such lease or moneys due for such timeshare interest for the balance of the term after the date of the rejection of such lease or timeshare interest, and any such renewal or extension thereof, any damages occurring after such date caused by the nonperformance of any obligation of the debtor under such lease or timeshare plan after such date, but such lessee or timeshare interest purchaser does not have any rights against the estate on account of any damages arising after such date from such rejection, other than such offset.

(i)(1) If the trustee rejects an executory contract of the debtor for the sale of real property or for the sale of a timeshare interest under a timeshare plan, under which the purchaser is in possession, such purchaser may treat such contract as terminated, or, in the alternative, may remain in possession of such real property or timeshare interest.

(2) If such purchaser remains in possession—

(A) such purchaser shall continue to make all payments due under such contract, but may, offset against such payments any damages occurring after the date of the rejection of such contract caused by the nonperformance of any obligation of the debtor after such date, but such purchaser does not have any

rights against the estate on account of any damages arising after such date from such rejection, other than such offset; and

(B) the trustee shall deliver title to such purchaser in accordance with the provisions of such contract, but is relieved of all other obligations to perform under such contract.

16. Section 363(f) states:

The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if—
(1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;
(2) such entity consents;
(3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
(4) such interest is a bona fide dispute; or
(5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

17. Section 363(h) states:

Notwithstanding subsection (f) of this section, the trustee may sell both the estate's interest, under subsection (b) or (c) of this section, and the interest of any co-owner in property in which the debtor had, at the time of the commencement of the case, an undivided interest as a tenant in common, joint tenant, or tenant by the entirety, only if—
(1) partition in kind of such property among the estate and such co-owners is impracticable;
(2) sale of the estate's undivided interest in such property would realize significantly less for the estate than sale of such property free of the interests of such co-owners;
(3) the benefit to the estate of a sale of such property free of the interests of co-owners outweighs the detriment, if any, to such co-owners; and
(4) such property is not used in the production, transmission, or distribution, for sale, of electric energy or of natural or synthetic gas for heat, light, or power.

residents own life estates. Likewise, since § 363(f) speaks of sales free and clear of "liens", not interests of life tenants, it, too, seemingly does not apply. Even if § 363(f) applied to this sort of problem, subsection (5) thereof would appear an insurmountable barrier, as we know of no authority permitting a remainderman to force a life tenant to cash out his interest.[18] Obviously, if the debtor owns a remainder interest in Blackacre, it may sell only that, and not the entire fee.

The upshot of this discussion is that regardless of the nature of the residents' interests, the debtor may lack the power to oust the residents from possession of their respective units. Consequently, its sale of the property may leave the purchaser powerless to do so. Since a purchaser could not be assured of immediate possession of all of the premises upon purchase, and since a prospective buyer might have legitimate uses for this property other than as a residence for the elderly, the market for the property is dampened by a sale by or through the debtor. Therefore, the bank maintains, the only safe way to involuntarily dispose of the residents' interest in the property is through a properly conducted foreclosure proceeding. *Dolese v. Bellows-Claude Neon Co.*, 261 Mich. 57, 245 N.W. 569 (1933). Only that way can it be sure that the interests of the residents, whatever they may be, are effectively cut off and that it will be able to get a fair price for the facility.

We find ourselves in agreement with the bank's view of the situation, if for no other reason than we cannot find the flaw in its analysis. It appears to us that were the bank or an as-yet undiscovered purchaser to take title to the property without foreclosure, there would be serious questions regarding the rights of the residents. Although the debtor contends that there are other means of terminating the residents' life estates (the debtor has not, thankfully, suggested terminating the residents themselves as a viable alternative), the debtor has not convinced us that there is any method equal to or better than foreclosure. "Indubitable" means "not open to question or doubt", *Webster's Third New International Dictionary*, 1154 (1981). The debtor, which has the burden of proof on this issue, has failed to persuade us that its proposal absolutely gives the bank equivalent or greater rights than it would have pursuant to foreclosure proceedings.[19] Therefore, the instant proposal to give the bank a power of sale, etc., is not the "indubitable equivalent" of its rights to foreclose on the facility, and cannot serve as the basis for adequate protection.[20]

## CONCLUSION

To briefly summarize the foregoing findings of fact and conclusions of law, we find that the debtor did not lease the property from the bank, but instead entered into an arrangement more like a purchase with the granting back of a purchase money mortgage. Even were we to find the transac-

---

**18.** Query, however, the implications of Mich. Comp.Laws § 600.2930; Mich.Stat.Ann. § 27A.2930.

**19.** In so holding, we do not wish to give the impression that proposal like the debtor's would be insufficient in other circumstances. The debtor's attempt to provide non-cash adequate protection is creative and, if the debtor were the only party with a ·possessory interest in the property, might well be sufficient. However, on the unusual facts of this case, we are compelled to hold that the proposal will not make the bank's interest as secure as if it commenced foreclosure.

**20.** In its argument, the debtor promised to brief the legal issue of whether it has the power to remove the residents. It also promised to bring

an adversary proceeding for a declaratory judgment naming the residents as defendants to seek a prompt ruling on this issue. [Tr. at 73–76] At this time, we are unaware that any such proceeding has been filed.

The Official Residents' Committee supported the debtor's opposition to the bank's motions. It called its chairman as a witness. Mr. Fred Klaus testified that in order to assist the debtor in its defense, the Committee had requested all residents under life-care contracts to execute and deliver quit-claim deeds in escrow. Of course, without unanimity, this tender would be useless. By the time of the hearing he had obtained 34 of the necessary 70 deeds.

tion to constitute a lease, we hold that § 365(d)(4) of the Bankruptcy Code would not cause it to be automatically rejected, as the facility is not "nonresidential real property" as that term is intended to be interpreted. With regard to the bank's request for relief under § 362(d)(2), we hold that, although the debtor lacks equity in the property, at this early stage in this Chapter 11 case, it cannot be said that the debtor has no possibility to consummate an effective reorganization. However, in order for the debtor to retain the property until it chooses a particular mode of reorganization and obtains confirmation of such, it must provide adequate protection to the bondholders. We hold that the proposal heretofore made by the debtor, providing a power of sale to the bank, is not the "indubitable equivalent" of the bank's lost opportunity cost. We further find that the value of the bank's collateral is $3 million, on which it is entitled to receive a return of 11% from the date upon which it filed the motion for relief. From these figures we calculate that the bondholders are entitled to protection of lost opportunity costs of $27,500 per month. Unless the debtor comes forward with an acceptable, equivalent substitute, the only method to adequately protect this interest is by cash payments.

Lastly, we are not blind to the potentially apocalyptic effect of our ruling on the debtor. Because we hold that monthly payments of $27,500 have been due since April 4, 1985, the debtor is now (5 months later) hit with an immediate liability of $137,500. Although we cannot say this with any authority, we doubt that the debtor has the means to tender a lump sum in this amount. Its inability to do so should not be the death knell for this Chapter 11. This is a relatively large and unquestionably complex case, which has resulted in some delay in fully resolving the issues herein. Now that a determination has been made, the debtor should be given a reasonable opportunity to make provisions to comply with our ruling. Accordingly, we believe that it would be equitable to allow the debtor to pay these already due payments in installments. Without taking proofs as to how long the debtor should be allowed to make up this "arrearage", we simply attempt to reach a fair result. It seems to us that 13½ months, the time which the bank said was necessary for it to foreclose on the property, is a reasonable period. This would allow the debtor to cure the "arrearage" by making monthly payments of $10,185.19 over and above the continuing payments of $27,500. This determination is based solely on equitable considerations, and the parties have not had an opportunity to comment on this solution. Thus, upon timely motion of either party, the Court will reconsider whether a different schedule of repayments should be adopted. Of course, the debtor is also free, at least in theory, to propose some other form of adequate protection in lieu of periodic cash payments.

If the debtor is unable to pay these or the current payments, or promptly propose some other form of adequate protection, our conclusion of law is that the debtor has not provided and cannot and will not provide adequate protection for the bondholders' interest in the property; consequently, the Court will grant the bank's motion for relief from the stay for cause, i.e.: lack of adequate protection. Before entry of such an order, however, a hearing will be set at which the debtor will be asked whether it can comply with these conditions. The final order will await the result of that hearing.