**In re Phillip G. ROBERTS and Maida M. Roberts, Debtors.**

Bankruptcy No. 86–09112.

United States Bankruptcy Court, E.D. Michigan, N.D.

July 18, 1986.

Harvey D. Walker, Saginaw, Mich., for debtors.

Donald B. Lawrence, Jr., for Federal Land Bank of St. Paul.

Rozanne M. Giunta, Bay City, Mich., for Commercial Nat. Bank.

## MEMORANDUM OPINION RE: MOTIONS OF FEDERAL LAND BANK OF ST. PAUL AND COMMERCIAL NATIONAL BANK FOR RELIEF FROM THE AUTOMATIC STAY

ARTHUR J. SPECTOR, Bankruptcy Judge.

After an evidentiary hearing on the combined motions of Commercial National Bank (Commercial) and The Federal Land Bank of St. Paul (Land Bank) for relief from the stay for cause, 11 U.S.C. § 362(d)(1), held on May 29 and 30, 1986, the Court hereby issues its findings of fact and conclusions of law, pursuant to Bankruptcy Rule 7052.

### FINDINGS OF FACT

1. Phillip and Maida Roberts (Debtors) filed their voluntary petition for relief un-

der Chapter 11 of the Bankruptcy Code on February 26, 1986.

2. Land Bank is owed $1,302,386.35 by the debtors, which claim is secured by mortgages on various parcels of farm real estate owned by the debtors.

3. Commercial is owed $818,766.72 by the debtors, which claim is secured by mortgages on various parcels of farm real estate and by a security interest on farm machinery owned by the debtors.

4. On March 17, 1986, Commercial filed its motion for relief from the stay seeking authority to foreclose the real estate mortgages and repossess certain farm equipment of the debtors.

5. On April 4, 1986, Land Bank filed its own motion for relief from the stay to allow it to foreclose various real estate mortgages on property owned by the debtors.

6. Approximately 1130 acres of land owned by the debtors in Gratiot County, Michigan are mortgaged to the claimants in this contested matter. These parcels are:

| Parcel | Acres | Location–Twp. | Nickname | Improvements | Movant |
|--------|-------|---------------|----------|--------------|--------|
| A | 80 | § 1, North Star | Baker | ——— | Comm. |
| B | 100 | §§ 8, 17, Lafayette | Lytle | 2 silos | Comm. |
| C | 80 | § 8, Lafayette | Boulton | 2 houses | Comm. |
| D | 77 | § 21, Emerson | Eichorn | ——— | Comm. |
| E | 120 | § 21, Emerson | Lumsden | house & barn | Comm. |
| F | 59 | § 23, Emerson | Sanders | ——— | Comm. |
| G | 80 | § 8, Lafayette | Fosgard | house & outbuildings | Land Bk. |
| H | 159 | § 4, Lafayette | Bowditch | ——— | Land Bk. |
| I | 80 | § 2, Lafayette | Spaulding | ——— | Land Bk. |
| J | 78 | § 8, Lafayette | C. Roberts | ——— | Land Bk. |
| K | 40 | § 11, Lafayette | Spaulding | ——— | Land Bk. |
| L | 97 | § 7, Lafayette | Doyle | ——— | Land Bk. |
| M | 80 | § 23, Washington | Chapko | 2 houses & outbuildings | Land Bk. |

7. After deduction for the liens of purchase money lenders, the value of the farm machinery on or about February 26, 1986, was $177,805.00.

8. The fair market value of the real property on or about the date the petition for relief was filed was as follows:

| | |
|---|---|
| Parcel A | $ 65,706.00 |
| Parcel B | $ 94,812.50 |
| Parcel C | $ 92,564.53 |
| Parcel D | $ 63,242.03 |
| Parcel E | $108,717.38 |
| Parcel F | $ 39,132.25 |
| Parcel G | $105,816.30 |
| Parcel H | $129,026.70 |
| Parcel I | $ 68,660.18 |
| Parcel J | $ 61,663.50 |
| Parcel K | $ 29,377.50 |
| Parcel L | $ 85,287.25 |
| Parcel M | $ 63,273.15 |

9. Commercial possesses a third mortgage position behind the Small Business Administration and the land contract vendor on Parcels D, E and F in which the aggregate of the balances owed on the prior liens equals approximately $182,943.00. As a consequence, Commercial's equity in those three parcels is $28,148.66.

10. Commercial also possesses a second mortgage position behind land contract vendors only as to Parcels A and C in which the aggregate of the balances owing on the prior liens equals $98,996.00. As a consequence, Commercial's equity in those two parcels is $59,274.53.

11. Commercial also holds a first mortgage position on Parcel B. As a consequence, Commercial's equity in that property is $94,812.50.

12. Commercial also holds first secured party status with respect to all farm machinery listed in the appraisal listed above. As a consequence, Commercial's equity in the farm machinery is $177,805.00.

13. Land Bank holds a fourth mortgage position behind Commercial, Small Business Administration and the land contract vendors in Parcels D, E and F. As a consequence, Land Bank has no equity in those parcels.

14. Land Bank also holds a third mortgage position behind Commercial and the land contract vendors in Parcels A and C. As a consequence, Land Bank has no equity in those two parcels.

15. Land Bank also holds a second mortgage position behind Commercial in Parcel B. As a consequence, Land Bank has no equity in that property.

16. Land Bank also holds a first mortgage position with respect to Parcels G, H, I, J, K, L and M. As a consequence, Land Bank's equity in these parcels is $543,-104.58.

17. The farm machinery is depreciating at the rate of 15% per annum on a straight line basis.

18. The rate of interest that each movant could earn if it could foreclose its secured interests and re-loan the proceeds is 11%.

## CONCLUSIONS OF LAW

A. Commercial has a secured claim in this case, for the purposes of this contested matter, in the amount of $360,040.69, of which $177,805.00 is represented by a first secured position in farm machinery; $94,-812.50 is represented by a first mortgage in farm real estate; and $87,423.19 is represented by a junior mortgage on real estate.

B. Land Bank's secured claim in this case, for the purposes of this contested matter, is in the amount of $543,104.58, all of which is represented by a first mortgage in farm real estate.

C. In order to protect Commercial's secured claim with respect to the farm machinery, the debtors would have to protect said creditor against physical deterioration and economic obsolescence of the machinery (i.e.: depreciation) of 15% per year, which equals $26,670.75 per year; insure the property against loss; and provide for the adequate protection of the claimant's opportunity cost computed at 11% per annum on the $177,805.00 claim, to-wit: $19,558.55. As a consequence, besides insuring and maintaining the property, and continuing to pay senior liens thereon such as accruing property taxes, the debtor would have to protect against an opportunity cost loss and depreciation expense of $46,229.30 per year, or $34,671.98 for the roughly nine months from the date the motions were filed until the time of eventual payment in December.[1]

D. With respect to that portion of Commercial's secured claim which arises from its mortgages on real estate, except with respect to improvements on the property, neither depreciation nor maintenance is a factor; however, besides continuing to pay senior liens thereon such as accruing property taxes, the debtor would have to protect against an opportunity cost loss of $20,045.93 per year ($182,235.69 × 11%), or $15,034.45 for the roughly nine months from the date the motion was filed until the time of eventual payment in December.

1. Although the computation of what interest payments are due the creditor is calculated from the date the petition for relief is filed, the debtor is not obligated to make any payments until such time as the creditor moves for relief from the automatic stay or adequate protection. *In re Independence Village*, 52 B.R. 715, 13 B.C.D. 637, 13 C.B.C.2d 476 (Bankr.E.D.Mich. 1985); *In re Bear Creek Ministorage, Inc.*, 49 B.R. 454, 12 B.C.D. 1337, 12 C.B.C.2d 1098 (Bankr.S.D.Tex.1985). In this case, Commercial and Land Bank filed their requests for relief in late March and early April, respectively, so that the debtors' proposals for adequate protection must be pro-rated over the remaining nine months of 1986.

E. Land Bank's secured claim may be adequately protected by maintaining and insuring the improvements and paying prior liens such as current property taxes and paying or protecting the opportunity cost of $59,741.50 per year ($543,104.58 × 11%), or $44,806.13 for the roughly nine months from the date the motion was filed until the time of eventual payment in December.

F. The debtors' proposal for adequate protection appears to be [2] as follows: pay $6,042.00 this year on the Eichorn land contract on Parcel D; $10,700.00 this year on the Lumsden land contract on Parcel E; $3,260.00 this year on the Sanders land contract on Parcel F; and $58,906.00 to Cecil Roberts for application to undisclosed land contract vendors, as well as maintaining and insuring the collateral and paying 9% interest each to Land Bank and to Commercial on their respective secured claims. Although there appears to be no express provision for paying currently accruing property taxes, the debtors' cash-flow projection contained in their Exhibit #2 does contemplate payment of $61,341.00 in real property taxes and late payment penalties in December, 1986, and so we assume tax payments constitute part of their proposal.

G. The debtors have not offered adequate protection of the movants' secured claims in this case.

## DISCUSSION

The value of the farm machinery was not contested.[3] We use the value determined by Al Galloway, the appraiser retained by Commercial. The land values were arrived at by the following process. The debtors' own valuation of the property and that of their non-expert witness, Mark Graham, were disregarded as unreliable. The testimony of Commercial's expert witness, Al Galloway, was considered of some, but little, weight. Most reliable was the testimony of Land Bank's expert witness, Thomas P. Williams, an MAI appraiser. However, his valuation was not definitive; instead, it was just our starting point for valuing the real property in this case.

Mr. Williams evaluated all tillable acres at $1,000.00 per acre and all non-tillable acres at $300.00 per acre. These, he said, represent the "market values" of the land he appraised. He defined "market value" as "the most probable selling price; it's that price that a property will bring in a competitive market resulting from negotiations between a buyer and seller, each acting prudently with knowledge and without undue stimulus ... [Further, one must] ... have the properties exposed to the market for a typical marketing period for that type of property in that market."

■ We believe, in this case, market value is *not* the test to be used. What we are endeavoring to determine is how much the automatic stay of § 362(a) of the Bankruptcy Code is costing these movants. *In re American Mariner Industries, Inc.*, 734 F.2d 426 (9th Cir.1984);[4] *In re Indepen-*

2. We note that debtors' exhibit #2 is inconsistent with debtors' exhibit #5 on the issue of proposed land contract payments. Exhibit #2 shows that the debtors expect to pay $6,016.00 on the Boulton land contract; exhibit #5 shows that only $3,038.00 would be paid. Exhibit #2 shows that Chemical Bank would be paid $8,658.00 on the Baker land contract while Exhibit #5 shows no payment to that creditor at all. Exhibit #2 shows a payment to Cecil Roberts of $20,008.00 while exhibit #5 discloses payments of $18,126.00, $31,000.00, and $9,780.00, for a total of $58,906.00. The party opposing the motion for relief from stay, in this case the debtors, has the burden of proof on the issue of adequate protection. 11 U.S.C. § 362(g)(2). Such confusing proofs do not aid the debtors in meeting their burden.

3. The debtors offered no evidence whatsoever on the value of the farm machinery. In their opening statement they offered to stipulate that its value was $156,000, as that is what they said Commercial's own appraisal showed. At trial, however, Commercial established that the value upon which it had a lien was really $177,805.00.

4. *In re Briggs Transportation Co.*, 780 F.2d 1339 (8th Cir.1985) contributes little to our analysis here. *American Mariner* held that secured creditors are entitled to interest payments (or other adequate protection) as a matter of law for their inability to foreclose upon their collateral while it is protected by the automatic stay. As the dissent to *Briggs* cogently points out, the majority did *not* hold that creditors are entitled to compensation for lost opportunity costs. Thus,

*dence Village, Inc.,* 52 B.R. 715, 13 B.C.D. 637, 13 C.B.C.2d 476 (Bankr.E.D.Mich. 1985). The inquiry is this: but for the imposition of the automatic stay, what could these movants have done to realize money from their secured positions in these assets? The evidence discloses that the market for farm real estate in this region is presently so poor that a proper time period for exposing a property of this type to the marketplace in order to get a fair market sale can, according to Mr. Williams, range from one to three years. It is unlikely we will let this case proceed for three years without lifting the stay or confirming a plan, so the automatic stay is not preventing these movants from realizing fair market value; however, it is preventing them from realizing *some* value.

The debtors argue that liquidation value should be utilized in determining the interest these creditors have which should be adequately protected. They maintain that liquidation value of these parcels is $700.00 to $725.00 per acre, based on the apparent sales price of similar parcels at an auction held by Land Bank and other sellers on April 10, 1986 in Alma, Michigan, and that it is this figure which should be used in calculating the value of the real estate mortgages here. However, it became clear at the hearing that the apparent sales prices of the parcels sold at the auction were not the actual prices. The true sales value of all tillable acres sold in the April 10, 1986 auction was, according to Mr. Williams, $879.25 per acre. This value is somewhere between liquidation value and fair market value, because in a liquidation, due to external time pressures to sell, the

seller generally sells without reserve, while at fair market value, the seller is under no external pressure to sell. The method chosen in the Alma auction—auction with reserve—indicates a substantial desire by the seller not to wait for a fair market price (which could mean waiting up to three years for a buyer) yet an unwillingness to let the properties go at any price. In short, the Land Bank, with recent economic problems of its own, was undoubtedly under some pressure to sell some of its inventory of foreclosed land now, but not under the degree of pressure which characterizes a forced sale.

For this reason, we value each tillable acre at $879.25, in other words, 87.925% of fair market value as described by Mr. Williams ($879.25 ÷ $1,000 = 87.925%). With respect to the improvements on the properties (homes, barns, silos, etc.) we discounted Mr. Williams' fair market valuation by the same 12.075% of fair market value. We did not further discount the $300.00 per acre figure for non-tillable land, finding that to be rock-bottom under any valuation method.[5]

We also find that Commercial, being a national bank, and subject to national banking regulations which limit the time banks may own foreclosed land, is also under some outside time compulsion to liquidate its inventory of foreclosed properties. Therefore, we presumed that a balance between outright liquidation and fair market value is appropriate for Commercial as well. Although Mr. Williams did not appraise the parcels on which Commercial held a mortgage, because of the proximity and similarity of these parcels to the ones

*Briggs* "sets free the bankruptcy court without any guidance whatsoever on the entitlement issue." *Briggs,* 780 F.2d at 1351 (Gibson, J., dissenting). Unless *American Mariner* is wrong, and opportunity cost is *not* entitled to adequate protection—and that position is defensible—a debtor must provide *some* form of protection. That protection may, but need not, be cash payments.

**5.** These are the fair market values as of the time the motions for relief were filed. In a recent opinion, *In re Ahlers,* 794 F.2d 388 (8th Cir. 1986), the Eighth Circuit Court of Appeals held

that the bankruptcy court should have determined what the value of the land would be at the time the secured creditors could obtain their collateral after foreclosure and sell it. *Ahlers,* at 397. Although that analysis makes a certain amount of sense, we decline to apply it here because the parties apparently agreed that valuation should be as of the date the motions were filed, and additionally because there was no evidence whatsoever in the record indicating that land values a year or so from now will be any lower than they are now.

he did appraise, we utilized the same method as to those. Mr. Galloway's appraisal did not specify how much of each parcel appraised was tillable and how much was non-tillable. Extrapolating from the other parcels, however, we assumed that 90% of each parcel was tillable and the balance was non-tillable. This methodology led us to the results stated above.

■ We find the debtors' offer of adequate protection to be inadequate because: (a) it proposes nothing other than maintenance, insurance and periodic payments without offering to pay the movants enough to protect their interests in the collateral; and (b) even if they offered sufficient periodic payments, they are unable to produce sufficient cash to pay it, and have offered no additional liens or other form of protection.

As stated above, the debtors offer to pay Commercial interest of 9% per year on the value of its collateral which they computed to be $322,957.00. Thus, they propose to pay Commercial $7,266.53 on June 1, 1986 and $16,955.26 on December 31, 1986, for a total this year of $24,221.79. We found that Commercial's claim is valued at $360,040.69 and that to protect it adequately, the debtors would either have to pay or otherwise protect $49,706.43 ($34,671.98 + $15,034.45) for the remainder of this year. Thus, the proposal as to this creditor is insufficient to adequately protect its interest.

The debtors' offer to pay the Land Bank comes closer, but also falls short of being adequate. Based on their computations, the debtors would pay this creditor $12,072.00 on June 1, 1986 and $28,168.00 on December 31, 1986, for a total this year of $40,240.00. We have found that to protect this entity, the debtors would either have to pay or protect $44,806.13 for the remainder of this year. Thus, the proposal as to Land Bank is inadequate by some $4,500.00.

This is also not a case where the debtors have the ability to increase the payments offered. Debtors' exhibit # 2, a cash flow projection for this year's crops, disclosed that they would only have $44,916.00 available to pay the $64,461.79 promised to these movants. It is therefore clear that the debtors will lack the cash to make the payments out of this year's operations. In fact, they expect to borrow the $19,545.79 shortfall from Mr. Roberts' father. (The debtors expect further income to be received in 1987 for sales of 1986 crops, and that this borrowing will be repaid from this income.) Since the amount needed will be over twice as large as what is available ($49,706.43 for Commercial + $44,806.13 for Land Bank = $94,512.56 − $44,916.00 available = $49,596.56 shortfall), it is clear that the debtors lack the ability to protect Commercial through periodic payments alone.[6] Also, although the debtors' projections as to future yields and prices are within reason, their assumption that nothing untoward will occur between planting and harvesting is unjustified. Indeed, Mr. Roberts conceded that it is not unusual for something unexpected to go wrong, be it weather, commodity prices, mechanical difficulties, health, pests or other assorted misfortunes. The projections are therefore based largely on a best-case hypothesis. As reluctant as we are to let a creditor's skepticism cause us to doom a reorganization at an early stage, *see In re Independence Village, Inc.*, 52 B.R. at 726, 13 B.C.D. at 644, 13 C.B.C.2d at 488, we must temper our hope for a successful reorganization with respect for the laws of nature, probability and economics. *See In re Martin*, 761 F.2d 472, 477 (8th Cir.1985). We recognize that in farm cases it is often very difficult for a debtor to provide adequate protection for the claims of secured creditors in the *American Mariner* mold. 132 Cong.Rec. S.5556–5558, (Daily ed. May 7,

---

6. However, it is troubling that the debtors intend to pay Mr. Roberts' father $58,000 per year. Unless this is the appropriate annual payment on the debtors' contract obligation for the purchase of Parcel J, it is likely that such a payment is improper and detracts from, instead of adding to, the adequacy of the protection offered.

1986). However, this difficulty is a policy problem, better addressed to Congress.[7]

Computing the appropriate interest rate to use when applying various sections of the Bankruptcy Code is one of the most difficult jobs of a bankruptcy judge. Rarely is there an adequate record. The question is usually one both of law (i.e.: do you use market rate, contract rate or some other rate?), and one of fact (What *is* the market rate?). This problem arises in a variety of contexts: § 1129(a)(9)(C); § 1129(b)(2)(A)(i)(II); § 1129(b)(2)(B)(i); § 1325(a)(4); § 1325(a)(5)(B)(ii); § 1325(b)(1)(A); § 726(a)(5);[8] and, of course, in the § 362(d)(1)/§ 361 adequate protection context we have here.

Our Court of Appeals has explained in the context of § 1325(a)(5)(B) that the "current market rate of interest used for similar loans in the region" is the gauge to use. *Memphis Bank & Trust Co. v. Whitman*, 692 F.2d 427, 431 (6th Cir.1982); *see also Cardinal Federal Savings & Loan Assoc. v. Colegrove (In re Colegrove)*, 771 F.2d 119 (6th Cir.1985). The rationale behind the "market rate" holding was that in such situations the creditor "was making a new loan to the debtor in the amount of the current value of the collateral", *Whitman*, 692 F.2d at 431.[9] In other words, the focus is on determining the price for money which a hypothetical borrower, similarly situated, would have to pay to obtain a loan of this type. But that is not the rationale for the adequate protection mandated under the *American Mariner* analysis. Instead, the inquiry is what *this particular creditor* would be earning today but for the automatic stay. It matters not at what rate this or a hypothetical debtor could borrow money if in fact this creditor could loan out money at a higher rate. On the surface at least, it would appear that the

---

7. Indeed, the Senate has addressed it by passing S. 2211, containing the Family Farm Reorganization Act, which has a section specifically overruling *American Mariner* for proposed Chapter 12, i.e., family farm reorganization, cases. Cong.Rec., *supra.*

8. 11 U.S.C. § 726(a)(5) calls for paying creditors at this rung of the distribution ladder interest on their pre-petition claims at the "legal rate". What is the "legal rate"—is it the finance company legal rate, the non-regulated individuals' maximum legal rate if the contract is in writing; the rate if the contract is silent; the judgment rate, the criminal usury limit; etc.? Is each creditor entitled to whatever rate is provided in its own contract or the maximum rate allowed that type of creditor as a matter of law?

9. In *Hardy v. Cinco Federal Credit Union (In re Hardy)*, 755 F.2d 75 (6th Cir.1985), the Court of Appeals held that a Chapter 13 plan which proposed payment of 100% of all claims over the period of the plan was not confirmable because when the total of payments was reduced to present value, it was less than the 100 cents on the dollar all creditors would receive immediately if the case was instead a Chapter 7 liquidation proceeding. It directed that before a bankruptcy court confirms a Chapter 13 plan, it should run through a present value analysis of the plan's proposal and compare it with the outcome of a liquidation. We are proud to say that this is precisely the exercise we have utilized even before *Hardy* mandated it.

However, we were and still are unsure as to what interest rate to utilize when discounting to present value. If the objecting creditor is a consumer finance company and is legally entitled to make small loans under $500.00 at 31% annual interest rate (Mich.Comp.Laws § 493.13; Mich.Stat.Ann. § 23.667(13)) and routinely does so, is that the rate to use? On the other hand, there are many creditors whose contract calls for no interest whatsoever. Do we use 0% as a discount factor, or the 5% rate fixed by Michigan law (Mich.Comp.Laws § 438.31; Mich.Stat. Ann. § 19.15(1)) when no interest rate is stated in the contract? Do we assume that the mass of creditors constitutes one hypothetical unsophisticated investor who would invest the money at passbook rate (5%), or at CD rate for a CD whose term was equivalent to the period of the plan, which can be less than three or up to five years in length (6¾% through 8%)? If most of the claims are held by institutional lenders, should we use prime rate (8½% for money center banks at the time of the hearing, but according to Commercial, 11½% in farm country)? But institutional lenders don't lend only at the prime rate; they also lend money through installment loans at 15% or so, and through bank credit cards of 19.8% or more. Which rate is appropriate? Should we use the weighted average of the interest rates on the various claims? Is testimony necessary in each case? Is this something which should be fixed by a local rule? Although *Hardy* endorsed the philosophy underlying provision of interest to creditors, it failed to explain the method that courts should use, and we are still struggling with the issue.

bankruptcy judge's job in performing the *American Mariner* analysis is simpler, since all we have to do is ask the bank what it would earn on the money if it had the money today. *In re Bear Creek Ministorage, Inc.*, 49 B.R. 454, 457 (Bankr.S.D. Tex.1985). Unfortunately, further analysis reveals this simplicity to be illusory.

In this case, Commercial showed that its prime rate of interest was 11½%. It also stated that this is its only rate of interest for loans of this type. However, we presume that Commercial also makes mortgage loans. If it does, then we also assume that it is competitive in its region and therefore likely charges a rate of approximately 10–11% on mortgage loans. Why should we assume that if Commercial got its money out of this case today, it would turn around and loan it out to another farmer at 11½%? Why shouldn't we assume that it would loan that money out in the home mortgage market at 10–11%? Maybe it would make used car loans at 15%, or would make some other use of it. Furthermore, although the bank claims that it would earn 11½% on its money if it could only have it, this assumes that every one of its borrowers pays back the money on time. As we know all too well, that is not the case. Maybe the bank's effective overall interest rate after deducting loan losses is 9%, or some other figure. The point we make here is that it is not so easy to divine what the appropriate rate of return to the movant ought to be.

As stated above, even though its cost of funds at the time of trial was only 6½%, Commercial has claimed that its current interest rate was 11½%. Although there is no evidence on this point whatsoever,[10] we will make the arbitrary assumption that Commercial would experience some loss on some of these 11½% loans and that its effective rate would only be 11%.[11] Likewise, the Land Bank introduced evidence that its current rate was 12% on some loans, 10.9% on a two-year fixed rate loan and 12½% on its normal rate loan. However, it conceded that it expected a reduction in that loan rate in the near future because such rate was not competitive in the marketplace. For this reason and because of our arbitrary assumption that some of its loans will go down the tubes,[12] we find that it would effectively net no more than 11% on the proceeds of its secured claim if it could have them back.[13]

■ In addition to contesting the amount of the proposed adequate protection payments, the movants asserted that they were entitled to adequate protection payments from the time they filed their motions for relief from the automatic stay,

---

**10.** In the context of a motion for relief from stay, which must be resolved on an accelerated schedule, there is likely to be too little time to do proper discovery on these quite complex issues. It is the debtor's burden of proof to show that the interest rate it proposes as part of its offer of adequate protection is appropriate. § 362(g). If the proofs are weak, the weakness must be read against the debtor. However, since it is the movant which usually has this information, it might be a good idea to insist that the movant provide such information at the earliest possible time, be it with the filing of the motion, or at the very latest, shortly after the preliminary hearing.

**11.** In *Memphis Bank & Trust Co. v. Whitman*, 692 F.2d 427 (6th Cir.1982), the Sixth Circuit, rightly or wrongly, (*see Independence Village*, 52 B.R. at 731, n. 3, 13 B.C.D. at 647, 13 C.B.C.2d at 495), gave bankruptcy courts a certain amount of *carte blanche* to determine the appropriate interest rate in the absence of proofs.

**12.** In this case, not so arbitrary given the current state of the Land Bank's portfolio.

**13.** We have entirely discounted Mr. Roberts' testimony that the Farmers Home Administration (FmHA) would be interested in loaning them money—for some undisclosed reason—at 5⅝% interest, and that FmHA's current "high rate" of interest on other loans is 8⅝%. What a different creditor gets for its money is of very little, if any, weight on the question of what a particular movant would be able to get on its rate. The only relevancy it would have is that it might be some evidence that the movant's rate is so far above market rate that it could not expect to actually find customers willing to borrow at that rate. In this case, the testimony is of virtually no weight. Also, we disregard the debtor's proposed 9% interest rate, presumably determined to be some approximation of the prime rate, for the reason that it has absolutely no evidentiary basis in the record.

and that these payments must be made monthly. Partial payments in June and December are unacceptable to them. In a recent case by the Eighth Circuit Court of Appeals, *In re Ahlers*, 794 F.2d 388 (8th Cir.1986) it was held that periodic payments to provide a secured creditor adequate protection of its interest need not commence until such time as the creditor under-secured by real estate collateral could actually sell the property after purchasing it at foreclosure sale and waiting for the expiration of the redemption period. *Id.*, at 395–96. *See also In re Bear Creek Ministorage, Inc.*, 49 B.R. at 458, n. 9. For reasons explained in *In re Independence Village, Inc.*, 52 B.R. at 730, 13 B.C.D. at 646–647, 13 C.B.C.2d at 494, we disagree with this proposition. Instead, we hold that adequate protection must be provided from the time that the undersecured creditor moves for such relief. We take this position for the following reason, best explained by a hypothetical. Suppose the stay is not lifted and the debtor does not have to provide adequate protection until the redemption period expires. (In Michigan, as in Minnesota, the period when dealing with farm property is usually 13½ months from the first date of publication of the notice of foreclosure.) When that day comes, and the debtor fails to make the adequate protection payment, the creditor will presumably return to court to ask that the stay be lifted to allow it to institute foreclosure proceedings. Assuming that relief is granted, the creditor must wait an *additional* 13½ months before it can sell the property to a third person. The delay in the timing of payments required under *Ahlers* [14] effectively *doubles* the time it may take for the creditor to obtain title to property, a result inconsistent with the holding of *American Mariner* that adequate protection should, as nearly as possible, approximate the creditor's bargained-for rights. On the other hand, if the procedure is permissible in the state in which the property is located, a proposal which provides the mortgagee a deed in lieu of foreclosure, to be effective in the event that adequate protection payment is not made within the extended period, may be appropriate. *See Independence Village, supra*, 52 B.R. at 734, 13 B.C.D. at 649, 13 C.B. C.2d at 499.

█ Even though payments are due earlier than 13½ months after the motions were filed, the debtors assert that there is no requirement that payments be made monthly. Since they, like most farmers, receive income irregularly during the course of a year, semi-annual payments are a reasonable and acceptable means of providing adequate protection. In *Ahlers*, the bankruptcy court held that the payments must be made monthly. The Court of Appeals reversed, noting that such a requirement "ignores the cyclical nature of agriculture. A grain farmer's income is not dependent on a monthly paycheck, but rather upon the harvest of his crops at the end of the growing season." *Ahlers*, 794 F.2d at 398. We agree with the court on this point. It is difficult enough for many farmers—including the Roberts—to provide payments great enough to adequately protect the creditors' interests; requiring monthly payments, when income is received, by the very nature of the business, only sporadically, throws an additional and unreasonable roadblock before the debtors as they attempt to reorganize. Indeed, in the "real world" outside bankruptcy court, farm lenders often receive payments from mortgagees only at those times of the year when they realize income. We see no reason why those lenders should have any additional expectations here.

As the debtors' proposals for adequate protection fall short of the mark, they have failed to meet their burden of proving that Commercial and Land Bank are not entitled to relief from the stay under § 362(d)(1). The lack of adequate protection constitutes cause under that section for lifting the stay. However, before this opinion could be rendered, the debtors filed an amended offer of adequate protection with respect to each of these creditors. These proposals

---

**14.** *See also In re Bear Creek Ministorage, Inc.*, 49 B.R. 454, 12 B.C.D. 1337 (Bankr.S.D.Tex.1985).

will be set for hearing forthwith; if they too prove inadequate, an order for relief from the stay will enter for each of these movants.